### Victor James Ironside *vs.* Louis S. Levi.

Suffolk.   December 9, 1931. — December 28, 1931.

Present: Rugg, C.J., Wait, Sanderson, & Field, JJ.

*Pledge. Corporation,* Transfer of shares.

In a suit in equity to compel the defendant to deliver to the plaintiff a certificate of corporate stock, it appeared that the plaintiff, the owner of the shares, had borrowed money and as security had delivered to the lender the certificate unindorsed and accompanied by a stock power in the usual form signed by the plaintiff in blank, his signature being guaranteed by a bank; that the lender then borrowed money of the defendant and as security delivered the certificate to him, telling him that it belonged to one of his employees, a person other than the plaintiff; that the defendant made inquiry at the bank as to the genuineness of the plaintiff's signature, but, relying on the genuineness of the signature, made no inquiry as to the plaintiff or the circumstances of the certificate's being in the lender's possession; that, except as may be inferred from the foregoing facts, the defendant never had heard of the plaintiff and had no knowledge of any claim of the plaintiff before the beginning of the suit; and that the lender's indebtedness to the defendant had not been paid. An interlocutory decree was entered that the bill should be dismissed unless the plaintiff tendered a certain sum of money to the defendant within a certain time, in which event the defendant was ordered to deliver the certificate to the plaintiff; and, the plaintiff having failed to make such tender, a final decree dismissing the bill thereafter was entered. *Held,* that

(1) The plaintiff did everything required by G. L. c. 155, § 27, to transfer title to the certificate to the lender;

(2) The defendant, as pledgee of the certificate, was a "purchaser" thereof within the meaning of G. L. c. 155, § 26 (1);

(3) In the circumstances, the plaintiff had not shown that the defendant did not receive the certificate in "good faith" within the meaning of the statute;

(4) As a *bona fide* purchaser for value, the defendant was entitled to hold the certificate to secure the loan made by him to the lender; and the decrees were proper.

Bill in equity, filed in the Superior Court on April 4, 1931, and described in the opinion.

The suit was referred to a master. Material facts found by the master are stated in the opinion. By order of *Qua,* J., there was entered an interlocutory decree confirming

the master's report. A further interlocutory decree entered by order of *F. T. Hammond*, J., and a final decree entered by order of *Whiting*, J., are described in the opinion. The plaintiff appealed from the second interlocutory decree and from the final decree.

*J. M. Spillane*, (*S. Kaufman* with him,) for the plaintiff.

*M. Brown*, for the defendant.

SANDERSON, J. This suit was brought to compel the defendant to turn over to the plaintiff certain certificates of stock which he originally owned, and which he had pledged to a money lender named Almy D. Adams as security for loans made to him by Adams and which were rehypothecated by Adams to the defendant to secure loans from the defendant to Adams. The plaintiff's appeals were from an interlocutory decree ordering that the bill would be dismissed unless the plaintiff tendered to the defendant a specified sum of money on or before July 13, 1931, and further ordering, in case such tender should be made, that the defendant turn over to the plaintiff certificates for shares of stock therein specified, and from a final decree dismissing the bill after the plaintiff failed to make any tender of money to the defendant.

The case was referred to a master who found as follows: On or about May 3, 1930, the plaintiff borrowed $1,000 of Adams and pledged to him as collateral security for the loan certain shares of stock, and on later dates other shares were delivered as collateral security for the same loan, and for the loan of an additional sum of money. The certificates representing the shares pledged either were accompanied by a stock power in the usual form signed by the plaintiff but blank as to transferee and as to the person to exercise the power of attorney, the signature of the owner in such case being guaranteed by The First National Bank of Boston, or were indorsed by the owner and his signature guaranteed by a Boston stock exchange house. Before entering into negotiations with Adams the plaintiff made an independent investigation of Adams's reputation and was told that it was good. The defendant was in the business of lending money on collateral and had known

Adams for about ten years. On October 23, 1930, at the request of Adams the defendant lent him a sum of money for which a note was given signed by Johnson, an employee of Adams. As collateral security for the payment of the note Adams, through Johnson, delivered to the defendant certain certificates of stock which on the same day Adams had received from the plaintiff as collateral. On December 23, 1930, when this note fell due, it was returned to Adams and the loan increased, Adams giving the defendant a new note signed by Johnson. At the time this note was given additional collateral security in the form of shares of stock which Adams had received from the plaintiff as collateral was given by Adams to the defendant. On February 24, 1931, this note was renewed and the amount of the loan increased. On November 29, 1930, at the request of Adams, the defendant made an additional loan to Adams on a note signed by Johnson, and Adams then delivered to the defendant as collateral security for the payment of this note additional certificates of stock which the plaintiff had pledged to Adams. This loan was again increased on March 2, 1931. At the time the defendant received the certificates he called at the First National Bank to see if the signatures purporting to be those of the plaintiff were genuine and was informed that they were. The defendant was told by Adams in each instance that the stock offered as collateral belonged to Johnson. The defendant did not ask how this came about nor how the stock got into Adams's possession nor who Ironside was nor whether the securities were being carried by Adams on margin. In each case when a loan was made by the defendant he received the certificates of stock from Johnson and gave him the check therefor. Although Johnson's name was used both in the checks and in the notes, it was understood that he had no real interest in or responsibility therefor and kept none of the money. The defendant had never heard of the plaintiff and had no knowledge of any claim of the plaintiff before the beginning of this suit, except as may be inferred from the facts found and from the exhibits. He relied on the genuineness of the signatures

transferring title to the stock. On March 27, 1931, the defendant sold the shares in one corporation receiving therefor a sum of money, a part of which was paid to Adams and the balance credited against the note dated February 24, 1931, leaving a substantial balance then due on this note. As the value of the collateral security had so depreciated that it was not sufficient to secure the note dated March 2, 1931, in accordance with its terms, the defendant, who had previously received written authority from Johnson to sell at the market all the securities which he held as collateral for the note last mentioned, on April 3, 1931, instructed brokers to sell them. On the following Monday, April 6, 1931, the defendant, having learned that the plaintiff had called at his office claiming the certificates, communicated with the brokers and, finding the stock had been sold on April 4, gave instructions to buy it back. This was done and the defendant sent his own check for the expense of repurchase. The master further found that the customary method of transferring certificates of stock in Boston from man to man and from firm to firm is indifferently by indorsing such certificates in the name of the owner or by indorsing a stock power which accompanies the certificate with the name of the owner; that such certificates when guaranteed as to the signature by a bank or by a New York or Boston stock exchange house are regarded as negotiable; that if a stranger should bring in a certificate so indorsed or with a stock power it would not be sold without some further inquiry. In such cases the broker would ordinarily ask to have the stock transferred to the name of the owner. The report states that counsel for both parties stipulated that all the corporations whose certificates are the subject of controversy in this case were organized in States in which the uniform stock transfer act is law, and that in consideration of the legal effect of any transfers of the certificates in controversy the provisions of that act apply in the same way as if the corporations concerned were incorporated in this Commonwealth and the transfers had been here effected.

By the provisions of G. L. c. 155, § 27, title to a

certificate of stock and the shares represented thereby shall be transferred only (a) by delivery of the certificate indorsed in blank or to a specified person by the person appearing by the certificate to be the owner, or (b) by delivery of the certificate and a separate document containing a written assignment of the certificate or a power of attorney to sell, assign or transfer the same or the shares represented thereby, signed by the person appearing by the certificate to be the owner of the shares represented thereby. This assignment or power of attorney may be either in blank or to a designated person. The plaintiff as former owner of the certificates appeared to have done everything required by this statute to transfer title to the stock to Adams, and the defendant, if he received them in good faith for value, would be entitled to hold them to secure the loans made by him to Adams. G. L. c. 155, § 33.

In *Baker* v. *Davie*, 211 Mass. 429, 436, the court said that the principle of law established by *Scollans* v. *E. H. Rollins & Sons*, 179 Mass. 346, and *Russell* v. *American Bell Telephone Co.* 180 Mass. 467, is "that if the owner of stock knowingly places in the hand of another the certificate therefor, either indorsed in blank or by a separate instrument of transfer and power of attorney, the person to whom the certificate and instrument are delivered can pass a good title by delivery or pledge regardless of the relations between him and the owner. This is not on the ground that the certificate becomes a negotiable instrument, but on the ground of estoppel, because the owner, having given another such indicia of title as clothes him with the appearance of ownership, is precluded from setting up title in himself as against a holder in good faith." See *Loring* v. *Goodhue*, 259 Mass. 495, 498.

The word "purchaser" as used in the uniform stock transfer act, unless the context or subject matter otherwise requires, includes pledgee. G. L. c. 155, § 26 (1). *Andrews* v. *Worcester, Nashua & Rochester Railroad*, 159 Mass. 64, 67. "A thing is done in 'good faith' within the meaning of

said sections when it is in fact done honestly, whether it be done negligently or not." G. L. c. 155, § 26 (2).

In *Freeman's National Bank* v. *Savery*, 127 Mass. 75, 79, the court said in referring to good faith of one taking a negotiable promissory note: "A suspicion that there is a defect of title, or a knowledge of circumstances which might excite suspicion in the mind of a cautious person, or even gross negligence, not amounting to evidence of fraud, or bad faith, will not defeat the title of the purchaser." See *Puffer* v. *Hazzard*, 240 Mass. 195, 198.

Upon the findings of the master the defendant took the certificates for the shares of stock for value and without knowledge or notice of the actual transactions between the plaintiff and Adams, and upon those findings the plaintiff has not maintained the burden of proving the defendant did not take the stock in "good faith" within the meaning of those words as used in the statute. The plaintiff, therefore, had no greater rights in the shares of stock, or the certificates representing them, after they had been pledged to the defendant in the circumstances stated, than Adams would have had. The conclusions reached by the master and the trial judge are not controlled by the facts upon which the plaintiff relies, some of which are to the effect that the plaintiff's indorsement was not upon the certificates themselves; that the plaintiff had not in fact authorized the hypothecation of the certificates by Adams for more than the amount of the loans; that there was no express assent in the powers of attorney to a repledging of the securities; that Adams was not a stockbroker; that in some instances the stock powers of attorney were dated the day of rehypothecation to the defendant; that the defendant knew that Adams was engaged in the business of lending money on securities; that the rates of interest charged by the defendant were high; that Johnson had no interest in the transaction; and that the signatures of the plaintiff were guaranteed by a bank and not by a stock brokerage house. The rights of the plaintiff were protected by the opportunity given him in the interlocutory decree to re-

deem the securities by payment of the sum specified. Upon his failure to redeem in accordance with the terms of that decree, he has no just cause for objecting to the final decree.

> *Interlocutory decree affirmed.*
> *Final decree affirmed with costs.*