RALPH F. DEBOER *vs.* H. HENRY ANTHONY & others.

Suffolk.    April 7, 1938. — May 26, 1938.

Present: RUGG, C.J., LUMMUS, QUA, DOLAN, & COX, JJ.

*Corporation,* Transfer of shares.    *Uniform Stock Transfer Act.    Notice.*

The mere facts that, when an attempted delivery of a certificate of stock with a separate document of assignment and power of attorney in incomplete form was made by a broker to an agent of a purchaser, the agent refused to accept delivery and returned the documents to the broker, that the broker then complied with required formalities and redelivered the documents to the agent, who accepted delivery and paid the purchase price, and that the certificate was of shares of a Michigan corporation and was signed by the owner as president, did not put the agent or the purchaser on notice as to possible lack of authority in the broker to sell; and findings that in the circumstances, although the broker had no authority to sell, the agent and the purchaser acted in good faith and that the sale was valid under G. L. (Ter. Ed.) c. 155, §§ 24–44, were warranted.

BILL IN EQUITY, filed in the Superior Court on July 19, 1937.

From a final decree entered by order of *Greenhalge, J.,* the plaintiff appealed.

*R. M. Sullivan,* (*A. R. Kingston & B. B. Priest* with him,) for the plaintiff.

*M. Jenckes,* for the defendants.

Cox, J.    This is a bill in equity in which the plaintiff seeks to recover three stock certificates registered in his name and allegedly sold without his consent; or, in the

alternative, to have his damages assessed because of the alleged unlawful transfer of the certificates. The defendants, a partnership, doing business as Whitney & Elwell and Elizabeth F. Tobey, in their answers, set up a counterclaim against the plaintiff, Rule 32 of the Superior Court (1932), each alleging to be entitled to a dividend on twenty-five hundred shares of the stock represented by the three certificates, which was paid to the plaintiff after the certificates had been delivered to Whitney & Elwell "so that they had legal title to the same." The suit was referred to a master whose report was confirmed by interlocutory decree, and a decree was entered dismissing the bill as to all defendants except Anthony and Forgrave, copartners, doing business as Brown, Anthony & Company; ordering the plaintiff to pay Whitney & Elwell all dividends received by him on twenty-five hundred shares of the stock "while the same stand in the plaintiff's name"; ordering Whitney & Elwell to assign and transfer to the plaintiff five hundred of the shares; establishing that Anthony and Forgrave each is indebted to the plaintiff in the amount of $10,000; with costs to the plaintiff as against Anthony and Forgrave and costs to the defendants Whitney & Elwell, Tobey and Kinsman, as against the plaintiff.

The master found that the plaintiff is the president, treasurer and general manager of a Michigan corporation, the Applied Arts Corporation. Anthony and Forgrave, as copartners, doing business as Brown, Anthony & Company, were in the stock brokerage business, in Boston, and made an assignment for the benefit of creditors on June 29, 1937. For some time prior to June 1, 1937, the firm had been dealing in the unlisted stock of Applied Arts Corporation, and was the eastern correspondent of a brokerage firm in Detroit, Michigan, with which the plaintiff had made arrangements for the distribution of the stock. Through this connection, Forgrave and the plaintiff became known to each other. About May 28, 1937, Brown, Anthony & Company needed money and Forgrave conceived the idea of getting some by obtaining Applied Arts Corporation stock from the plaintiff. On that day he

telephoned the plaintiff and asked for a temporary loan of some of the stock. On June 1, 1937, Forgrave telephoned the plaintiff, who was in Michigan, that he had "taken a position" in the stock which required that he should temporarily have stock on hand and that he needed three thousand shares. The plaintiff said that he had three thousand shares that were part of an issue of ten thousand shares, which, however, could not be sold because that issue had not been approved for sale by the securities commission of Michigan. Forgrave told the plaintiff that he would not sell the stock and would return it within a few weeks, that the matter was urgent and that in the afternoon he would have his auditor speak to the plaintiff on the telephone; and asked him to tell the auditor that three thousand shares were being sent. The plaintiff said that he would send the stock. The plaintiff understood, and was given to understand by Forgrave, that the stock certificates were wanted so that it might appear for purposes of an audit that Brown, Anthony & Company had the stock on hand, and that when the certificates had served their purpose Forgrave would return them.

Between May 28 and June 1, Forgrave took up with the defendant Kinsman the question of raising money on Applied Arts Corporation stock. Prior to April 1, 1937, Kinsman, who was connected with a company, the Financial Independence Founders, had talked with Forgrave about having Brown, Anthony & Company sell Financial Independence Founders units, with the result that on April 1 Kinsman was placed in charge of a branch office of Brown, Anthony & Company for the purpose of organizing and developing the sale of these units. Brown, Anthony & Company paid him a salary and expenses and he was to have a share in any profits of the branch office, the expenses of which were to be borne by the company. This was the only relation that Kinsman had with Brown, Anthony & Company.

The defendant Tobey, who was a friend of Mr. and Mrs. Kinsman, had an account with Whitney & Elwell, a brokerage firm in Boston, and on September 8, 1936, in anticipa-

tion of her absence from the country, she had given Kinsman a printed form of Whitney & Elwell, authorizing him to buy and sell securities for her account and risk with that firm. On May 30, Kinsman told Mrs. Tobey that he had an opportunity to buy from Brown, Anthony & Company twenty-five hundred shares of Applied Arts Corporation stock at $3 a share; that it was selling for around $4 a share and that he felt confident that she could sell it within a month at a profit of one point. She returned to her home in New York on the following day, ascertained the price at which the stock was selling, telephoned Elwell, a partner in Whitney & Elwell, for his advice, and notified Elwell and Kinsman that she would purchase the stock. She directed Whitney & Elwell to pay for twenty-five hundred shares to be delivered to it for her account. The master finds specifically that in this transaction Kinsman did not purport to act under the power which Mrs. Tobey had given to him, and that she herself, and not through an agent, authorized Whitney & Elwell to make the purchase for her account.

On June 1, Forgrave, one Whittaker "of Brown Anthony," and Kinsman signed a memorandum agreement to the effect that Kinsman was to purchase twenty-five hundred shares of Applied Arts Corporation stock at $3 a share which he "may sell at any time he chooses. Before selling he must offer to B. A. & Co at $4 per share net — this not to apply 30 days after purchase. After 30 days and up to 60 days after purchase should he decide to sell if Brown Anthony & Co purchase they must do so at $4\frac{1}{2}$ dollars per share net." Kinsman did not tell Forgrave that he expected Mrs. Tobey to take the stock but Forgrave understood that someone other than Kinsman "was going to put up the money." In the afternoon of June 1 Forgrave telephoned again to the plaintiff and asked Kinsman to speak to him, which he did. The plaintiff told Kinsman that he was sending three thousand shares of Applied Arts Corporation stock. Kinsman did not know the plaintiff and knew of no reason why he should speak to him. The plaintiff thought he was talking with some auditor.

On June 3 the stock arrived by registered mail at the office in Boston of Brown, Anthony & Company. There were three certificates, each for "$1,000" (1,000 shares?) in the plaintiff's name, together with three printed forms of assignment, which were not filled in except for the signature of the plaintiff and the date, June 1, 1937. These assignment forms were as follows: "Form 488 ASSIGNMENT SEPARATE FROM CERTIFICATE     FOR VALUE RECEIVED...................................... hereby sell, assign and transfer unto........................... shares of the................standing in............... .name on the books of said...............represented by Certificate No..............herewith and do hereby irrevocably constitute and appoint...................... attorney to transfer the said stock on the books of the within named Company with full power of substitution in the premises. (Signed) R. F. DeBoer   Dated June 1, 1937 In Presence of................." The following letter was contained in the envelope: "APPLIED ARTS CORPORATION    Manufacturers    365 Lane Ave., S. W. Phone 93474    Grand Rapids, Michigan    June 1, 1937 Brown, Anthony & Company 24 Federal Square Boston, Mass.    Attention: Mr. W. Forgraves.    Gentlemen: As agreed I am forwarding you 3,000 shares of Applied Arts Corporation Stock, representing: Certificate No. 3804 — 1,000 shares   Certificate No. 3805 — 1,000 shares   Certificate No. 3806—1,000 shares   Accompanying I have included three signed 'Power of Attorneys.' Due to no consideration of any value received, this stock is being forwarded you on the condition that under no circumstances is it to be sold except with my written permission. As advised you, this stock has been issued by the Board of Directors but has not been approved for sale through the Michigan Securities Commission. As soon as this is passed for sale I will notify you to this effect as steps are now being taken to approve this and other stock within a short period of time. You will be kept advised of definite arrangements on this as this program develops. Would appreciate having you sign and return one of the copies of this letter.     Yours very truly

R. F. DeBoer    MG    Signed: R. F. DeBoer    Witnessed: M. Gillisse    Approved by: Brown, Anthony & Company    By    My commission expires Jan. 12, 1941." Forgrave wrote his signature on the letter and mailed it to the plaintiff.

The plaintiff understood that, in sending these assignments, he was putting it within the power of Forgrave to sell the stock but he expected him to keep his agreement not to sell. The master infers from these facts that the plaintiff sent the assignment forms signed by him because he understood that Forgrave wished it to appear that his firm was in a position to make delivery of the stock.

Forgrave sent the certificates and assignments by messenger to Whitney & Elwell. The messenger also took a letter addressed to Whitney & Elwell which was written by Kinsman who was in the Boston office of Brown, Anthony & Company at the time. The letter read as follows: "June 3, 1937    Whitney & Elwell    30 State Street    Boston, Massachusetts.   Gentlemen: Attention of Mr. Elwell We are delivering herewith 3000 shares of Applied Arts Corporation — For E. F. Tobey acct   Will you please give us check for $7500.00 and we will carry the additional 500 shares in the account to be handled in some way later. Yours very truly,    Brown, Anthony and Company H. Bruce Kinsman *Atty.*   H. Bruce Kinsman   HBK/n."

The certificates and assignments were brought to the attention of a partner of Whitney & Elwell and, by his directions, the messenger was told that the stock was not in deliverable form, in that the assignment forms were not filled in, nor the signatures of the owner guaranteed, nor transfer stamps annexed. The messenger returned to Forgrave with this information. Under Forgrave's instructions, his cashier filled in the blanks in the assignment forms by writing in the figures "1000" on each form before the printed words "shares of the"; the words "Applied Arts Corp." after the printed words "Capital stock of the"; and the figure "3804" after the words "Certificate No." on one form, the figure "3805" on another, and the figure "3806" on the third, these being the numbers of the three

certificates. He stamped on each of the forms a guaranty of the plaintiff's signature by Brown, Anthony & Company. The messenger wrote his name on each form under the printed words, "In presence of." The necessary transfer stamps were affixed to a separate sheet and each assignment form was attached to the stock certificate bearing the corresponding number. The guaranty of the plaintiff's signature by a member of the stock exchange was procured and placed on the three assignment forms. The messenger then delivered at Whitney & Elwell's office the three certificates and the three assignment forms as filled in, the sheet of transfer stamps and the letter to Whitney & Elwell, hereinbefore quoted, and received Whitney & Elwell's certified check dated June 3, for $7,500, payable to "Brown Anthony Co. a/c Elizabeth F. Tobey." The plaintiff was in Michigan on June 3, and had had no communication from Forgrave or from anyone connected with Brown, Anthony & Company after the telephone communication of June 1. The proceeds of the check were used by Brown, Anthony & Company to pay firm debts. The partner of Whitney & Elwell who saw the documents when they were first brought to his office also saw them when they were returned. There was no evidence to show that Mrs. Tobey or Whitney & Elwell knew who the plaintiff was or where he was, except that Whitney & Elwell might have seen from an inspection of the face of the certificates dated March 20, 1937, that the plaintiff's name was signed thereon as president of the corporation. The assignments were filled in with a different colored ink from that used in the signatures and dates, and a "somewhat careful comparison would seem to indicate" that the blanks were not filled in by the same hand which wrote the signatures and dates. Mrs. Tobey confirmed by letter the purchase by Whitney & Elwell for her account of the Applied Arts Corporation stock. Neither Mrs. Tobey nor Whitney & Elwell claim any interest in five hundred shares of the three thousand which were delivered to Whitney & Elwell.

About June 19, Anthony asked Kinsman if he knew there were any restrictions on the sale of the stock, and Kinsman

replied that he did not. Anthony said he was not sure but thought there were. Kinsman told Forgrave what Anthony had said and was told by him, in substance, that everything was all right. Kinsman learned that no confirmation of the sale of the stock had been received by Whitney & Elwell and, in order to protect Mrs. Tobey, at Kinsman's request and with Forgrave's approval, a confirmation of the sale, addressed to "E. F. Tobey c/o Whitney and Elwell" and dated "as of June 1, 1937," was made by Brown, Anthony & Company and sent to "E. F. Tobey c/o Whitney & Elwell." About June 3, Kinsman gave Mrs. Tobey the written agreement of June 1, hereinbefore described, which required Kinsman to offer the stock to Brown, Anthony & Company before any sale. Mrs. Tobey, up to August 1, was ready and willing to resell the stock to Brown, Anthony & Company or its assignee at the price provided for in this agreement. She made no offer to do so nor was any request made that she do so. Whitney & Elwell at all times since June 3 held the stock for Mrs. Tobey's account. The master specifically found that the purchase was entirely Mrs. Tobey's and that it was her money that Brown, Anthony & Company received. "Mrs. Tobey had no actual knowledge of any restriction on the right of Brown Anthony to sell her the stock, and . . . she purchased the stock in entire good faith." He states: "If material, I also find that Kinsman and Whitney & Elwell had no actual knowledge of any restrictions on the right of Brown Anthony to sell the stock, at least prior to Kinsman's conversation with Anthony on June 19 . . . and that Kinsman and Whitney & Elwell acted in good faith in the matter. The plaintiff contends that the circumstances attending the two deliveries to Whitney & Elwell as set forth herein constitute constructive notice of a lack of authority to make delivery. So far as that may be a question of fact, I find that these circumstances did not constitute constructive notice." The master declined to draw the inference from the facts that, when Forgrave was willing to sell the stock at $3 a share at a time when there had been sales at around $4.50, this was sufficient to put Kinsman and Mrs.

Tobey on notice that there was "something wrong," his reason, among others, being that it did not appear that a bid for two thousand shares or more could have been expected to be readily obtained at more than $3. He attaches no significance to the fact that Whitney & Elwell did not at once fill in the blanks in the assignments with the name of the transferee and forward the stock for transfer, in view of the fact that Mrs. Tobey did not expect to hold the stock for long, and understood that it was subject to the right of Brown, Anthony & Company to repurchase. He found that on June 1 and June 3 a fair salable value of twenty-five hundred shares of the stock would be $4 a share "provided a reasonable time may be assumed for disposing of that amount of stock," and that an amount of twenty-five hundred shares could not have been sold quickly in the general market to net much more than $3 a share. It is agreed that the uniform stock transfer act, "Mass. General Laws Ch. 155, Secs. 24 to 44," inclusive, is, and during the period in question has been, in force in Michigan. The stock in question has not been approved for sale by the securities commission of Michigan or of Massachusetts. The plaintiff has taken steps to prevent the transfer of the stock on the books of the corporation pending the outcome of this litigation.

It is for this court to decide the case upon the master's report in accordance with its own judgment, the facts in the report being accepted as true unless mutually inconsistent and plainly wrong. *Cohen* v. *Silver*, 277 Mass. 230, 232. The plaintiff's contention is that the circumstances attending the delivery of the stock to Whitney & Elwell were such as to put upon it the duty of inquiring as to the authority of Brown, Anthony & Company; and that when it accepted delivery of the certificates, the transfer was not effectual under the uniform stock transfer act. G. L. (Ter. Ed.) c. 155, §§ 24–44. This act now governs the transfer of title in Massachusetts to shares in corporations of Massachusetts and of other States having laws consistent with it. Section 27 purports to state the "only" methods by which legal title may be transferred. *Edgerly*

v. *First National Bank of Boston*, 292 Mass. 181, 185, and cases cited. By § 27 (b) a certificate and the shares represented thereby may be transferred "By delivery of the certificate and a separate document containing a written assignment of the certificate or a power of attorney to sell, assign or transfer the same or the shares represented thereby, signed by the person appearing by the certificate to be the owner of the shares represented thereby," and this document may be made out to a specified person or in blank. By § 31 "The delivery of a certificate to transfer title in accordance with section twenty-seven shall be effectual, except as provided in section thirty-three, though made by one having no right of possession and having no authority from the owner of the certificate or from the person purporting to transfer the title." Section 33 provides, among other things, that "if the delivery of a certificate was made (c) without authority from the owner . . . the possession of the certificate may be reclaimed and the transfer thereof rescinded, unless — (1) The certificate has been transferred to a purchaser for value in good faith without notice of any facts making the transfer wrongful." Section 26 provides, among other things, that "A thing is done in 'good faith' within the meaning of said sections [24 to 44 inclusive] when it is in fact done honestly, whether it be done negligently or not." *Ironside* v. *Levi*, 278 Mass. 18, 22, 23.

It was said in the case of *Edgerly* v. *First National Bank of Boston*, 292 Mass. 181, 185–186: "Where . . . the signature of the owner is on a 'separate document,' that document must purport to assign, or authorize the transfer of, the 'certificate' or 'the shares represented thereby.' . . . It is no part of the purpose of the act to protect one who takes an irregular document on the faith of oral representations." In that case the separate forms of transfer of stock, which the plaintiff signed, when delivered to one Crowell, who subsequently delivered them to the defendant, did not contain the name of the transferee, the name of the stock or the number of shares. The officers of the defendant bank filled in the description of stock which belonged to the plaintiff and which Crowell delivered to the

defendant bank with the transfer forms, as collateral security for a note of his own. The facts of the case in this respect are distinguishable from the facts in the case at bar. It also appeared in the *Edgerly* case that the transfer forms were not intended by the plaintiff to be used in connection with the stock that Crowell pledged wrongfully. In the case at bar, the plaintiff understood that in sending "these assignments signed by him he was putting it within the power of Forgrave to sell the stock" although he expected Forgrave to keep his agreement not to sell. The plaintiff's letter of June 1, 1937, in which he enclosed the stock certificates and transfer forms, warrants the inference that, if he gave his written permission to sell the stock, Brown, Anthony & Company would be in a position to effect the transfer by means of the transfer forms. In the *Edgerly* case it was said (pages 185–186), "When the defendant bank first saw that document [the transfer form], it contained no reference to the certificate in question nor to Moxie shares" (the shares pledged wrongfully). In this respect the case is like the case at bar. The court then goes on to say (page 186): ". . . the defendant bank, in taking that certificate and those shares, placed its reliance, not upon any apparent transfer over the signature of the plaintiff, but rather upon the representation of Crowell that he was authorized to make the plaintiff's signature apply to that certificate and those shares."

In the case at bar, however, Whitney & Elwell did not rely upon any representation of Brown, Anthony & Company that it had any such authority. It did not fill in the blanks on the transfer forms as did the bank in the *Edgerly* case. On the contrary, it caused Brown, Anthony & Company to be informed that the stock was not in deliverable form for the reasons that the transfer forms were not filled in, the owner's signature was not guaranteed and no transfer stamps were attached. Later on, when the certificates were returned to Whitney & Elwell, the transfer forms were in order.

We do not think that when the certificates and transfer forms were first presented to Whitney & Elwell it was put

upon any inquiry. The certificates were not accepted. Whitney & Elwell declined to complete the purchase. It was dealing with a stock brokerage firm which dealt in the very stock that was being offered for sale. It was acting for a client in the purchase of that stock who "had directed that it be purchased for her account." There is nothing to show that Whitney & Elwell knew the plaintiff or where he was beyond the fact that his name appeared on the certificate as president of the corporation. It did not know who filled in the blanks and in the circumstances was not required to investigate. It acted in good faith. We think the master was right in finding as a fact that in the circumstances Whitney & Elwell did not have constructive notice of a lack of authority on the part of Brown, Anthony & Company to make delivery of the stock. The cases cited by the plaintiff on the point of notice are distinguishable. In *Farrington* v. *South Boston Railroad,* 150 Mass. 406, the plaintiff had accepted a certificate of stock from the treasurer of the corporation purported to have issued it, as security for a personal loan to the treasurer. The stock had been newly issued and was made out directly to the plaintiff. See *Childs, Jeffries & Co. Inc.* v. *Bright,* 283 Mass. 283, 294. In the cases of *Scollans* v. *Rollins,* 173 Mass. 275, *Treadwell* v. *Clark,* 114 App. Div. (N. Y.) 493, and *France* v. *Clark,* 26 Ch. D. 257, the securities were actually accepted upon incomplete or blank transfers.

The decree dismisses the bill as against Whitney & Elwell, but inasmuch as affirmative relief is granted against this firm the decree should be modified so as to continue its members as defendants. · See *Booras* v. *Logan,* 266 Mass. 172. The second paragraph of the decree should be modified, if necessary, to include any dividends or distributions since the date of the decree. The defendants Whitney & Elwell, Tobey and Kinsman are to have their separate costs. In all other respects the decree is affirmed with costs to the plaintiff against Anthony and Forgrave.

*Ordered accordingly.*