ROBERT G. DYNAN & others[1] *vs.* EDWARD A. FRITZ, JR.,
& others.[2]

Middlesex.  February 5, 1987. — June 10, 1987.

Present: WILKINS, LIACOS, ABRAMS, NOLAN, & O'CONNOR, JJ.

*Corporation,* Stockholder, Purchase by corporation of its own stock, Offi-
cers and agents, Contract, Close corporation. *Fiduciary. Contract,* For
purchase of corporate stock. *Sale,* Of stock. *Practice, Civil,* Counsel
fees. *Collateral Estoppel.*

In the circumstances of a stockholders' derivative action, the judge had no
basis for concluding that a sale of treasury stock to the defendants was
part of an improper attempt to secure their control of the corporation.
[236-237]

An agreement between a corporation and its retiring president, insofar as
it provided for the corporation's repurchase of one-third of his stock on
June 30 in each of three years, limited the additional amount of stock
the corporation could issue prior to completion of the instalment repur-
chase, allowed the president to remain on the board of directors, and
permitted continuation of his health insurance benefits, was not shown
to be unfair to the corporation. [237-239]

In a stockholders' derivative action, it was error for the judge, in interpreting
a stock repurchase agreement, to conclude that the corporation's president
was collaterally estopped from contending that he should have the benefit
of a higher per share price in the repurchase of his own shares, where
the president had not been a party to, nor was he represented in, a prior
action in which a consent judgment was entered setting forth a lower
buy-back price computed on a different basis under the same agreement.
[239-240]

Where the terms of an agreement between a corporation and its president
were ambiguous with respect to the method of fixing the price at which
the corporation would repurchase the president's stock on his retirement,
the action of the board in fixing prices favorable to the president had
the effect, in the circumstances, of leaving the corporation's interests

---

[1] William J. Martin, Paul L. Bishop, William F. King, Anthony Accardi,
John C. Sakakini, Roger L. Powers, and Albert Clark.

[2] Robert F. Driscoll, Hùgo Bloomquist, Jr., Dorothy R. O'Brien, and
F.S. Payne Co.

unprotected by any disinterested director, and did not meet standards of good faith; accordingly, the judge who heard a shareholders' derivative action challenging the repurchase was warranted in treating as void both the agreement and the repurchase prices as determined by the president and assented to by the other directors. [240-243]

Where, in a stockholders' derivative action, it was established that the corporation's president and directors had not met standards of good faith, both in entering into an agreement under which the corporation would repurchase the president's stock on his retirement and in fixing prices for the repurchase, the arrangement was to be treated as voidable at the option of the corporation's disinterested stockholders. [243-244]

Under indemnity provisions in a corporation's by-laws, considered in light of the policy expressed in G. L. c. 156B, § 67, two directors and the clerk of the corporation were entitled to be reimbursed by the corporation for their reasonable counsel fees and expenses in defending a stockholders' derivative action. [245-246]

On remand of a stockholders' derivative action, the judge was to reconsider whether the plaintiffs should be reimbursed by the corporation for their reasonable counsel fees and expenses. [247-248]


CIVIL ACTION commenced in the Superior Court Department on July 6, 1984.

The case was heard by *John Paul Sullivan*, J.

The Supreme Judicial Court granted requests for direct appellate review.

*Kenneth H. Tatarian* (*Kenneth Ira Spigle* with him) for the plaintiffs.

*Gael Mahony* for Edward A. Fritz, Jr.

*Richard L. Neumeier* (*Jacqueline Y. Parker* with him) for Robert F. Driscoll & another.

*Joseph P. Donahue, Jr.,* for Hugo Bloomquist, Jr.

*John S. Leonard, George A. McLaughlin, Jr., & Michael J. Keefe,* for F.S. Payne Co., submitted a brief.

WILKINS, J. This stockholders' derivative action involves claims that the defendants, who own a majority of the outstanding stock of the defendant F.S. Payne Co. (company), unfairly manipulated stock ownership to gain control of the company and unlawfully approved the company's purchase of the stock of the defendant Fritz on terms unfair to the company. Following many days of trial, the judge made findings and rulings and

entered a judgment from which both sides have appealed. We granted the defendants' applications for direct appellate review.

We first describe the principal actors in this proceeding. The plaintiff Dynan, who owns 170 shares of stock in the company, was first employed by it in 1945, was elected a director in 1974, and served from 1974 to March, 1984, as a vice president and director. Dynan as director approved of the defendants' conduct of which he now complains in this action. The other seven plaintiffs, employees of the company, each own ten shares of its stock, except for Bishop, treasurer since November, 1982, and King, vice president for manufacturing since November, 1982, each of whom owns twenty-five shares. The defendant Fritz first became a company employee in 1960, is one of the company's three directors, owns 240 shares of stock in the company, and is a former president (from 1977 to 1982) and treasurer (from 1961 to 1982). Fritz purchased ten shares of company stock in 1961 and by various subsequent purchases had acquired 360 shares by July, 1973. He retired in January, 1983, and in 1983 sold 120 shares of stock back to the company in circumstances which, among other things, the plaintiffs challenge. The defendant Driscoll, an employee since 1952, is president of the company, one of its three directors, and the owner of 105 shares of company stock. The defendant Bloomquist, an employee since 1946, is the third director of the company, a vice president, and the owner of forty shares of its stock. The defendant O'Brien, an employee since 1953, has been the company's clerk since 1982, owns twenty-five shares of company stock, and has never been a director of the company.[3]

We next summarize the significant facts which appear in the judge's detailed findings. The company is a Massachusetts corporation which, since 1906, has been in the business of manufacturing and selling elevators and elevator supplies. The

---

[3] The plaintiffs own 270 shares; the defendants own 410 shares; and others, employees of the company but not parties to this action, own 130 shares. There are 810 shares of company stock outstanding.

The number of directors varied from three to four during the late 1970's and 1980's.

greatest number of stockholders in the company at any time has been forty. The company's stock is not traded on any stock exchange. For many years, all company stock has been subject to a restriction on its transfer, requiring, in details not material to this case, that it must be offered to the company before it may be sold to anyone else. The company's policy, largely adhered to, has been to sell stock only to its employees and current stockholders. Commencing in 1954 as to certain shareholders and continuing generally to date, the company's sales of stock have been made subject to so-called buy-back agreements, pursuant to which the company may elect, within stated time limits, to repurchase stock upon either the death or the termination of employment of the employee-stockholder. All outstanding company stock is now subject to buy-back agreements. The formula in each buy-back agreement states the price at which the company may repurchase each share as "the higher of (1) 56% of the net book value thereof, ascertained as of the close of the calendar year last preceding the day on which the event occurs from which the right of election to purchase the shares arises; or (2) six times the average annual earnings per share for the five years ended at the close of said calendar year."

One major issue in this case is whether formula valuations per share should be based on the number of shares outstanding or on the number of shares issued (the total of the outstanding shares and treasury shares [that is, shares of stock, once outstanding, that the company has reacquired]). The defendant Fritz arranged to sell his stock to the company on his retirement at prices based on the number of shares outstanding. He argues that the buy-back agreement clearly so provides. The plaintiffs claim that under the agreement Fritz was obliged to sell his shares at a price using the number of shares issued and that the conduct of the company and others in dealing with the buy-back agreement since 1954 compels that interpretation.

Although generally accepted accounting principles would normally point to the use of the number of shares outstanding in determining the per share net book value of stock and although the company followed that practice in the years immedi-

ately after 1954, the company came to use the number of shares
issued rather than the number of shares outstanding in determin-
ing buy-back prices. From 1954 to 1965, whenever the com-
pany repurchased shares it rather promptly sold them to employ-
ees and thus the difference between the number of issued and
the number of outstanding shares was not significant.[4] With
one exception, the company has sold its stock to employees
at the average cost to the company of its treasury stock (the
cost of all stock held in the treasury divided by the number of
shares of treasury stock).[5] In 1965, the company repurchased
610 shares which it did not immediately resell. Concerned that
the repurchase price under the buy-back agreement would fluc-
tuate if the company continued to use the number of outstanding
shares to determine the per share value under the buy-back
formula, in late 1965 the directors voted that all treasury stock
would be held as an investment, with the result that treasury
stock was treated as an asset and the number of shares issued
was to be used in the buy-back formula. The company made
various stock repurchases from 1966 through 1970 using this
method in each instance, although one retiring employee selling
120 shares contended that the appropriate calculation called
for the use of the number of shares outstanding. During this
time, offers of treasury stock to employees were not fully
subscribed. At the end of 1969, for example, 1,883 shares
were outstanding and 939 shares were held in the treasury.
Under pressure from its accountants, who questioned whether
in the circumstances the treasury stock was really being held
as an investment, the company reclassified its treasury stock,
effective December 31, 1970, from an investment to a deduc-
tion from capital and surplus on the liability side of the balance
sheet.

    We need not recite the details of the numerous stock trans-
actions during the 1970's. The company's position continued

-----

[4] At the end of each of these years, at least 2,740 of the 2,822 issued
shares were outstanding.

[5] No objection to the practice is made in this case. The price at which
the company has sold treasury stock has consistently been below the repur-
chase price determined by the buy-back formula under either view of the
number of shares to use in the denominator in calculating per share values.

to be that the number of shares issued was the appropriate number to use in computing the price to be paid per share under the buy-back formula. The company received some resistance on this point. In one instance, it was obliged to bring a lawsuit against a former president, Roland Marr, who claimed that outstanding shares should be used in valuing his stock on repurchase pursuant to the buy-back agreement. In the settlement reached in the Marr action in 1975 and otherwise, the use of the number of shares issued prevailed. There were, however, several repurchases after 1970 negotiated at prices not based, at least directly, on the formula in the buy-back agreement.

In 1982, the company agreed, after long negotiations and litigation, to repurchase the 226 shares of Milton Hickox, who had been president of the company. Hickox had suffered a stroke in early 1977, but arguably had been kept on as a company employee for many months. At the time of the repurchase of the Hickox stock, the plaintiff Dynan and the defendants Fritz and Driscoll were the members of the company's board of directors. After efforts to acquire the Hickox stock at lower prices had failed and Hickox had sued the company for a declaration that his stock was not subject to the buy-back agreement at all, all three directors had voted in December, 1981, to offer to purchase Hickox's stock at a per share price ($1,234.58), based on the number of shares outstanding. The Hickox lawsuit against the company was settled early in November, 1982, using the number of shares outstanding to arrive at the price the company paid for Hickox's stock. The judge was warranted in finding that the Hickox settlement was made at the higher price because it would set a precedent beneficial to each of the directors, particularly in establishing the price to be paid to Fritz on his upcoming retirement.

By this time, the defendant Fritz, the company's president, had attained the age of sixty-five, the company's normal retirement age. In August, 1982, Fritz, who then owned 360 shares of the 624 shares of stock outstanding, or about 58% of the stock, announced that he would retire on January 1, 1983. In November, 1982, the directors offered to sell 306 shares of

treasury stock to employees. Of these shares, all of which were purchased, ninety went to the defendant Driscoll (increasing his holdings to 105 shares), ten went to the defendant Bloomquist (increasing his holdings to forty shares), and fifteen went to the defendant O'Brien (increasing her holdings to twenty-five shares). Neither Fritz nor Dynan purchased any of the 306 shares. Four plaintiffs became shareholders for the first time, and three other plaintiffs, who had owned company stock for a number of years, acquired additional shares. Thereafter Fritz owned 360 of the 930 shares then outstanding, or about 39% of the company's outstanding shares.

We pause here to deal with the defendants' challenge to the judge's conclusion that the sale of stock to the defendant O'Brien in 1980[6] and to the defendants Driscoll, Bloomquist, and O'Brien in 1982, was "undertaken to secure control of the company by the defendants" and was improper.[7] We fail to see any justification for the judge's conclusion that the defendants undertook the 1982 sale to these three defendants (as part of the sale of 306 shares of stock) in order to secure control of the company. In late 1982, before the sale of additional stock to the other defendants, Fritz alone already controlled

---

[6] In 1980, the company sold O'Brien ten shares of stock at about $329 a share. O'Brien became the clerk of the company in November, 1982, but has never been a director. An employee of the company since 1953, she has served as a secretary and assistant to several officers. She had no significant role in the company's transactions which are challenged in this case. The judge made no finding that O'Brien ever did anything improper unless her acts of buying company stock were somehow improper.

In 1980 the company was considering whether to sell its manufacturing division, and the shareholders were evenly divided on the issue. O'Brien's ten shares might have broken a tie, but the issue never came to a vote. The motivation for the issuance of O'Brien's stock had become ancient history by the time the claims in this action arose. Indeed, there is little basis to challenge the sale of the ten shares to O'Brien when the plaintiffs are not challenging the company's repurchase of Hickox's shares in 1982, a transaction which the judge found the defendants improperly undertook to establish artificially the number of shares outstanding as the proper component in determining values per share.

[7] The judge ordered these defendants to return these shares of stock to the company, along with the amount of all dividends received on that stock, and ordered the company to pay each back the purchase price.

the company because he owned about 58% of its outstanding stock. The judge was warranted in finding that the other defendants cooperated and aided Fritz in his dealings with the company. On the other hand, the judge's conclusion that these stock sales were part of an attempt to secure control of the company cannot stand.[8]

We come then to the transaction that the plaintiffs most particularly challenge — the company's agreement to buy Fritz's 360 shares in three equal annual instalments coupled with the company's acceptance of the use, on each valuation date, of the number of shares outstanding in calculating the repurchase price. We start with what the parties call the Fritz amendment, a December 30, 1982, amendment of the buy-back agreement between the company and Fritz. This agreement did not in any way change the formula in the buy-back agreement for determining the purchase price. It provided that the company would repurchase 120 shares from Fritz on June 30, 1983, on June 30, 1984, and on June 30, 1985, valued in each instance as of the previous December 31. The Fritz amendment limited the additional amount of stock the company could issue (except for fair market value) prior to completion of the instalment repurchase, allowed Fritz to remain on the board of directors, and permitted his family health insurance plans to continue until all his shares were sold. In June, 1983, the

---

[8] The reason for the 1982 sale of the 306 shares of stock appears to lie in Fritz's desire that the sale of his stock to the company on his approaching retirement receive capital gain treatment. The judge noted that in September, 1982, Fritz had stated to the other directors that I.R.C. § 302(b)(2) (1982) imposed a requirement concerning the proportion of the stock which a seller could own after the first instalment of a sale compared to his proportion of the stock before the sale in order to qualify for capital gain treatment. The fact that the defendants may have used their influence to so reorganize the ownership of company stock as to provide Fritz favorable tax treatment is not a ground for complaint in this derivative action, in the absence of a showing that the company was harmed in some way and in light of the affirmative showing that the sale of the 306 shares helped to fulfil the company's goal of selling shares to its employees.

It seems likely that capital gain treatment of Fritz's stock sale (versus ordinary income treatment) more than offset the dilution of the per share value of his stock resulting from the sale of the 306 shares earlier in 1982.

company repurchased 120 of Fritz's 360 shares at a price of $2,202.18 a share, paying a total of $264,261.60.

The judge ruled that the Fritz amendment to the buy-back agreement was invalid because it secured an unfair advantage to Fritz at the expense of the company. He declared the Fritz amendment to be null and void.[9] All parties challenge his conclusion. We agree with them. Putting aside the highly disputed question of the price to be paid (which was not covered by the Fritz amendment itself), the agreement was a fair and reasonable one. The company, which had recently paid $337,000 to Hickox to settle its dispute with him, deferred its obligation under the buy-back agreement to pay for the Fritz shares in full almost forthwith. The company's financial position benefited from the rearrangement. Fritz's anticipated service on the board of directors for an additional two and one-half years has not been shown to be detrimental or unfair to the company. Nor has the cost of providing group health insurance to Fritz and his family in exchange for his services as a director been shown to be unfair to the company. The defendants Driscoll and Bloomquist and the plaintiff Dynan, who with Fritz constituted the board of directors at the end of 1982, all voted in favor of the Fritz amendment.

Although the Fritz amendment did not affect the method for determining the price at which the company would repurchase the Fritz shares, the directors (including the plaintiff Dynan) all understood and agreed that the price would be determined using the number of shares outstanding, as had been done in repurchasing the Hickox stock.[10] It is in the determination of

---

[9] He also ordered the company to return to Fritz his 120 shares and ordered Fritz to repay the $264,261.60 he had received for his shares.

[10] It appears that until this time the formula alternative used for determining repurchase prices had been "56% of net book value" because it had been higher than the "six times annual earnings" method. For the first instalment on the repurchase of the Fritz stock under the formula, using data as of December 31, 1982, the multiple of earnings method produced a significantly higher per share price ($2,202.18) than did the 56% of net book value method ($1,542.39). This is because the company's annual net earn-

Dynan v. Fritz.

the per share price, and not in the adoption of the Fritz amendment, that the problem lies.

This action was commenced on July 6, 1984, and had been threatened for some months. The company and Fritz decided to delay completion of the second and third instalments of their agreement.[11] By a second Fritz amendment, therefore, the time for the second and third redemptions was postponed by one year and the valuation dates were also advanced by one year. The record does not indicate what has happened since the second Fritz amendment in June, 1984.[12]

A major issue before the trial judge, as we have noted, was the proper interpretation of the buy-back agreement. Fritz argued that it unambiguously called for the use of the number of outstanding shares as the denominator in the determination of the per share repurchase price of his stock. The judge rightly rejected this contention. The provision that the "price to be paid for each share" shall be determined by a percentage of the net book value of each share or six times the average annual earnings "per share" did not compel the use of the number of outstanding shares in determining per share prices.

On the other hand, the judge erred in both of his reasons for concluding that Fritz's shares could properly have been repurchased under the buy-back agreement only at the lower per share price, one based on shares issued. The judge concluded that Fritz was collaterally estopped to deny such an interpretation of the buy-back agreement because the price per

---

ings, which had been averaging in the range of $50,000 to $66,000 in the 1960's and early 1970's, had significantly increased in recent years:

| | |
|------|----------|
| 1979 | $215,000 |
| 1980 | $276,000 |
| 1981 | $487,000 |
| 1982 | $387,000 |
| 1983 | $496,000 |

[11] The formula calculations as of December 31, 1983, indicated a per share price of about $2,794, totaling about $335,225.

[12] In his brief, Fritz advises that he has received no further payments for his stock and that he has not sold any additional stock to the company. He adds that the parties have maintained "the status quo pending the outcome of this litigation." In their reply brief, the plaintiffs say that there have been no changes in stock ownership since November, 1982, except for the repurchase of 120 of Fritz's shares.

share expressed in the 1975 consent judgment in the company's action against its former president, Roland Marr, was based on the number of shares issued. Collateral estoppel or issue preclusion has no application here. Fritz was not a party to the Marr action. The corporation was not acting for him, nor he for it, in any way that would preclude him from now arguing his own view of the language of the buy-back agreement. See *Rudow* v. *Fogel*, 376 Mass. 587, 589 (1978).[13]

The judge relied on a second and independent ground to conclude that the buy-back agreement provided for the use of the number of shares issued in determining the repurchase price of the company's stock. Deciding, we think correctly, that the agreement was ambiguous on the point, the judge turned to extrinsic evidence to explain its meaning. He looked at the company's conduct on the subject from 1965 to the date of the Fritz transaction and concluded that the company had consistently taken the position, except for the repurchase of the Hickox shares, that the per share repurchase price should be based on shares issued.[14] The company's conduct goes a long way toward showing that, from at least 1965, the company and its officers and directors regarded the buy-back agreement

---

[13] We shall not pause to consider whether we would carry forward distinctions between law and equity in deciding whether and in what respect parties (much less nonparties) are bound by a consent decree or by a judgment of dismissal (see *Macheras* v. *Syrmopoulos,* 319 Mass. 485, 486 [1946]; *Saugus* v. *B. Perini & Sons,* 305 Mass. 403, 409 [1940]) and whether issue preclusion (collateral estoppel) has any role in a judgment by consent. See Restatement (Second) of Judgments § 27 comment e, at 257 (1982) (consent judgments have collateral estoppel effect only "if the parties have entered an agreement manifesting such an intention").

[14] He also correctly rejected Fritz's argument that a good faith determination of the repurchase price made by a certified public accountant chosen by the company must be accepted as controlling. The agreement may fairly be read to require the company and the selling stockholder to accept as "final and conclusive" the accountant's calculations and his application of accounting principles in the determination of the company's "net book value and average annual earnings." The agreement, however, does not purport to bind the seller and the company to the accountant's determination of per share values and certainly does not delegate to the accountant an unreviewable authority to determine the legal consequences of a significant ambiguity in the buy-back agreement.

as providing for the use of the number of shares issued, and the circumstances show that various selling stockholders, but not all of them, agreed or at least acquiesced in that view for whatever reason or reasons. In any event, what others may have accepted cannot properly be instructive on what the buy-back agreement between Fritz and the company meant. What Fritz did as an officer and director of the company in representing the company's point of view, as he was obliged to do in the Marr litigation and in other matters, provides no guidance as to what Fritz as an individual believed the buy-back agreement to provide.

Because the buy-back formula contained a significant ambiguity, the company and Fritz appropriately could consider what the purchase price for Fritz's stock would be on his retirement. What the company could not properly do, however, was to permit Fritz to dictate the purchase price. The judge properly concluded that the defendants Driscoll and Bloomquist were not disinterested participants in the matter. Because the interests of the company were not protected by any disinterested director, including the plaintiff Dynan, the question arises whether Fritz nevertheless met his burden of proving that the agreement on the repurchase price, which the judge warrantably ruled involved self-dealing by Fritz, was made in good faith and was fair to the corporation. See *Winchell* v. *Plywood Corp.*, 324 Mass. 171, 175, 177 (1949). See also Principles of Corporate Governance: Analysis and Recommendations § 5.02 (Tent. Draft No. 5 1986). The judge concluded that Fritz had not met the burden of proving that he satisfied his duty of loyalty, but the judge so concluded because of an interpretation of the purchase prices to be paid under the buy-back agreement with which we do not agree.[15] The judge had

---

[15] The judge concluded that, because Fritz and the other defendants (with Dynan's agreement) caused the company to agree to buy his stock at a price substantially above what the buy-back agreement called for, Fritz had failed to meet his burden of showing "the good faith and inherent fairness" of that agreement. He then declared the Fritz amendment and the sale of the first instalment of 120 shares void. He ordered rescission of the Fritz amendment and the sale.

no need, in his view, to determine whether, if under the buy-back agreement the repurchase price was fairly open for negotiation and determination, the prices selected were fair, viewed as of the time of the making of the arrangement, and whether the agreement was made in good faith. There was evidence tending to show that the "negotiated" repurchase prices appeared to be fair and that the other shareholders would benefit from such a sale.[16]

On the other hand, the element of good faith was lacking from the Fritz negotiation, as the judge was warranted in concluding.[17] In the context of the repurchase of company stock

---

[16] The plaintiff Dynan testified that the equity in the company at the end of 1980 (and into 1981 and 1982) was worth about $6,000,000. That amounted to a per share value of over $7,000, using the number of shares outstanding before the 1982 sale of 306 shares. Dynan agreed that purchasing one-third of the company (worth $2,000,000) for about $750,000 would be a good buy.

The defendants introduced expert testimony (by deposition) that, on a "freely-traded minority interest basis," the fair value of the company's stock on December 31, 1982, was $2,440 per share and on December 31, 1983, was $3,200 per share, using the number of shares outstanding. The repurchase price calculated for the first instalment of Fritz's stock was $2,202.18 and for the second was $2,793.54.

We need not pause to consider whether in a derivative action, concerned with harm to a corporation, the appropriate value per share to consider is the freely-traded value and not the per share value discounted to reflect the fact that the shares are a minority interest in a closely held corporation.

[17] The judge's determination that the repurchase price arrangement was not arrived at in good faith is not impaired by certain of his conclusions which the defendants challenge. It was an overstatement, but not significant in his rulings, for the judge to conclude that the fact alone that Fritz could affect the repurchase price of his shares was "incompatible with his fiduciary responsibility to the Company." What Fritz did or did not do, and not what he could do, was the judge's crucial focus.

The company probably is a close corporation, as the judge ruled. However, the duty of care owed by one stockholder in such a corporation to another ("utmost good faith and loyalty," see *Donahue* v. *Rodd Electrotype Co. of New England,* 367 Mass. 578, 593 [1975]), which the judge concluded was applicable here, is not necessarily appropriate in deciding a derivative action where the alleged wrong sought to be redressed is to the corporation (*Durfee* v. *Durfee & Canning, Inc.,* 323 Mass. 187, 196 [1948]) and not to some portion of the stockholders. The two concepts tend to merge, however, when a shareholder's alleged self-aggrandizement, if true, hurts both the corporation and the interests of the other stockholders. Long

from an officer-director, good faith requires a full and honest disclosure of all relevant circumstances to permit a disinterested decisionmaker to exercise its informed judgment. See *Winchell* v. *Plywood Corp., supra* at 177-178; Principles of Corporate Governance, *supra* at § 5.02 comment a, at 27 (Tent. Draft No. 5) (some opinions "have expressed the view, embodied in § 5.02, that failure to make full disclosure affords an independent basis for the corporation to avoid the transaction"). Cf. G. L. c. 106, § 1-201 (19) (1984 ed.), defining good faith as "honesty in fact in the conduct or transaction concerned"; *DeBoer* v. *Anthony,* 300 Mass. 403, 412 (1938). Because there was no good faith conduct leading to the arrangement, the judge was warranted in treating as void both the Fritz amendment and the repurchase prices determined by Fritz and accepted by the other directors.[18]

Nevertheless, by returning the parties to the status quo as to Fritz's stock ownership, as the judgment below does, the company's problems are not solved. Equitable principles call for an attempt at resolution of at least some of them. Under the judgment in this case, Fritz, now no longer an employee, will continue to be a shareholder contrary to the company's practice (unless something has happened in the interim of which we are unaware). If the company's earnings have improved or at least stayed level in recent years, Fritz may reap a substantial benefit from the rescission of the Fritz amendment and the associated arrangement on the repurchase price. Rescission,

---

before the *Donahue* case we required "the utmost good faith" in cases in which one group of stockholder-directors, without a valid corporate purpose, used their control of the board of directors to obtain an unfair advantage over other stockholders. See *L.E. Fosgate Co.* v. *Boston Mkt. Terminal Co.,* 275 Mass. 99, 107-108 (1931) (issuing stock to themselves and others to gain voting control of the corporation). See also *Coggins* v. *New England Patriots Football Club, Inc.,* 397 Mass. 525, 532-533 (1986); *Elliott* v. *Baker,* 194 Mass. 518, 523 (1907).

[18] There is no need to remand the case for a finding whether the instalment purchase prices were fair to the company because, on the relief we order, the prices can be accepted by the disinterested stockholders and, if not accepted, the agreements are rescinded because of the absence of good faith, quite apart from the fairness issue.

moreover, by itself leaves the company without any basis for asserting its rights under the repurchase agreement. The dominance of Fritz prevented the company from making a good faith decision whether to assert its rights under its buy-back agreement with Fritz, as amended.

Fritz wants the agreement, as amended, to be carried out at his price. Perhaps a majority of the disinterested stockholders would now agree. Before rescission is ordered, the company's disinterested stockholders should be entitled to vote on whether to accept Fritz's stock on the terms agreed to by the company's directors on December 30, 1982, or on any modification of the arrangement more favorable to the company that Fritz may offer.[19] In a sense, therefore, the arrangement with Fritz, modified by the Fritz amendment and governed by per share values determined using the number of outstanding shares, is to be treated as voidable at the option of the disinterested shareholders. Their decision not to accept the arrangement will in effect be an election by the company to rescind the Fritz amendment and to reject a repurchase of Fritz's stock. Whether the defendants Driscoll, Bloomquist, and O'Brien and the plaintiff Dynan (and perhaps others) are disinterested stockholders depends on circumstances, including recent events, not known to us. We leave that issue to the trial judge in fashioning a judgment on remand from this court.[20]

---

[19] We reject the option that the stockholders now be permitted to vote to purchase Fritz's remaining shares as if pursuant to the buy-back agreement unamended, using the number of outstanding shares determined at a price per share valued as of December 31, 1982. We also reject the option of using the valuation dates of the second Fritz amendment or any more recent valuation dates. In effect, we are giving the company through its disinterested stockholders the option of holding Fritz to the agreement that should have been submitted to disinterested stockholders in early 1983.

[20] The buy-back agreements by which the company may repurchase its stock at a price which may not be closely related to its market value at the time of repurchase is a potential source of continuing trouble, particularly in times when the stock is worth significantly more than its repurchase price. In such circumstances, the incentives to obtain majority control and not to sell treasury stock at cost are strong. Assuming the company's financial capacity to repurchase shares as they become available on the death or retirement of stockholders, the pressure on continuing stockholders is strong

The judge ordered the defendants to pay their own counsel fees (and to reimburse the company for any counsel fees that the company had advanced). He declined to carry out the provisions of an indemnity by-law, which was in effect when the significant alleged harmful conduct in this case occurred (the purchase of the first 120 shares from Fritz). That by-law, which is set forth in the margin,[21] provided for indemnity of attorneys' fees in any case against an officer or director unless he is adjudged "not to have acted in good faith in the reasonable belief that his action was in the best interest of the company." The judge concluded that it would be against public policy to permit the by-law to operate to cover the defendants.[22] That policy judgment has already been made to the contrary by G. L. c. 156B, § 67 (1984 ed.), which authorizes such a by-law in words which are virtually identical to what is stated in the by-law. Although such a by-law (as well as § 67) is arguably too broad, and although § 67 has been labeled "uniquely bad" (J.W. Bishop, Corporate Officers and Directors Indemnification and Insurance § 6.29, at 133 [1981 & 1986 Supp.]), it is not appropriate, absent a valid constitutional challenge, for a court to disregard the authorization granted by § 67.

to keep the class of stockholders closed and to seek to be a survivor, as in a joint tenancy or in a tontine. If it has not done so, the company may wish to revise its buy-back agreements.

[21] "Each Director or Officer, present or former, threatened with or made a party to any action, suit or other proceeding by reason of the fact that he is or was a Director or Officer, shall be indemnified by the corporation against all liabilities and expenses, including counsel fees reasonably incurred by him in connection therewith.

"The corporation shall not, however, indemnify any Director or Officer with respect to matters as to which he shall be finally adjudged in any such action, suit, or proceeding not to have acted in good faith in the reasonable belief that his action was in the best interest of the company.

"The foregoing right of indemnification shall not be exclusive of other rights to which any director or officer may be entitled as a matter of law. In determining the reasonableness of any settlement, the judgment of the Board of Directors shall be final."

[22] In reaching this result as to all defendants, the judge discussed only Fritz's conduct as the reason for his conclusion.

The judge ruled that he had not made a finding that the defendants acted in bad faith. We construe this ruling, in the circumstances, as a determination that, on the findings of fact, the defendants would be entitled to counsel fees pursuant to the by-law but for the judge's public policy determination to decline to permit the by-law to operate.[23] The defendants are entitled to an order that the company pay their reasonable counsel fees and expenses.[24]

We deal briefly with various other issues raised by the plaintiffs in their appeal. (a) The judge rightly decided that the plaintiffs, who approved them, have no valid ground to challenge the company's by-laws adopted in February, 1983. (b) The judge was also correct in dismissing Dynan's challenge to the company's proposal to retire him early. The judge was warranted in finding that there was a legitimate business purpose in the proposal, that the company was not injured by the decision, and that a derivative suit is not an appropriate forum in which to pursue any personal claim Dynan might have. (c) The judge was justified, in his discretion, in not enjoining potential misconduct by the defendants. (d) There is no error in the judge's decision not to direct Bloomquist to repay compensation he received after his planned retirement date and in his decision not to require the directors to repurchase Bloomquist's stock. There is no suggestion that Bloomquist's compensation was unreasonably high or that he did not continue to

---

[23] Changes made in 1980 to G. L. c. 156B, § 65, restricting a director's freedom from liability by defining certain good faith conduct, were not similarly added to § 67 concerning indemnification for counsel fees and expenses.

[24] Counsel for the corporation presented the case here for allowing counsel fees and expenses to the individual defendants out of corporate assets. In a stockholders' derivative action, the role of counsel for the corporation (who should be independent and not have been involved in any challenged transaction) is to represent the interests of the corporation and not to advocate the interests of individual defendants, unless those interests coincide. See *Attorney Gen.* v. *Brockton Agricultural Soc'y,* 390 Mass. 431, 436 (1983). We do not say, and the plaintiffs have not argued, that counsel for the corporation could not properly argue here in support of the application of the company's by-law, even though success on that issue will cost the company thousands of dollars.

perform services for the company. The decision whether to repurchase stock under a buy-back agreement is a discretionary one for the directors. (e) The judge was amply warranted in concluding that Dynan was not an appropriate plaintiff in this action and that his conduct in voting in favor of various corporate action, such as the repurchase of Hickox's and Fritz's stock, was undertaken "to secure control of the Company for himself." The action properly can proceed, as the judge concluded, in the name of other stockholders. Dynan's motivation as the principal instigator of this action, challenging corporate action he approved of as a director, may have some bearing on the propriety of granting attorneys' fees to plaintiffs' counsel in this case.[25]

On remand the judge should reconsider the question of making an award of attorneys' fees and expenses to the plaintiffs. He denied them counsel fees because he did "not find that the defendants acted in bad faith." Although the fact of the bad faith or good faith of a defendant in a stockholders' derivative action is a factor that the judge may consider in his discretion in passing on the fee question (see *Smith* v. *Atlantic Properties, Inc.,* 12 Mass. App. Ct. 201, 211-212 [1981]), a finding of the defendant's bad faith is not essential to a lawful award of counsel fees in such an action. See *Sagalyn* v. *Meekins, Packard & Wheat, Inc.,* 290 Mass. 434, 437, 440-441 (1935) (counsel fees and expenses awarded to successful plaintiffs in a stockholders' derivative action where defendants acted in good faith). The most important, but not dispositive, factor in deciding whether counsel fees should be awarded at all is whether the plaintiffs have benefited the corporation in some way by the result obtained in the lawsuit. The judge may not have all the necessary information to pass on the counsel fees question

---

[25] The plaintiff Bishop testified that Dynan had said that Dynan would be solely responsible for attorneys' fees.

In April, 1984, Dynan rejected an offer from the company to repurchase his stock at almost $2,800 per share, accompanied by other benefits, including $120,000 in severance pay over three years.

until after the stockholders' meeting is held, if one is held, to decide whether to vote to purchase Fritz's stock.[26]

The judgment is vacated. A new judgment shall be entered declaring: (1) there is no basis for the rescission of either the sale of ten shares of stock to the defendant O'Brien in 1980 or the sales of stock in 1982 to the defendants Driscoll, Bloomquist, and O'Brien; (2) all defendants are entitled to payment of their reasonable counsel fees and expenses; (3) the 1983 by-laws may not be challenged by these plaintiffs; (4) the challenge by the plaintiff Dynan to the proposal to retire him early is not properly part of this shareholder derivative action; (5) the December 30, 1982, agreement between Fritz and the company, known as the Fritz amendment, shall be rescinded and Fritz shall repay to the company the amount ($264,261.60) he received in 1983 for his 120 shares of stock in the company (plus interest at the legal rate less the amount of dividends he would have received on those shares if he had not sold them) and the company shall return to Fritz a stock certificate representing 120 shares of stock in the company, unless, at a stockholders' meeting duly called and held within three months of the entry of the judgment after rescript, a majority of the disinterested stockholders (whose status shall be determined by the judge and described in the judgment after rescript), present and voting, shall vote to purchase Fritz's remaining 240 shares of stock, 120 shares to be valued as of December 31, 1983, and 120 shares to be valued as of December 31, 1984, under the buy-back agreement between Fritz and the company, using the number of shares of stock outstanding on each date, respectively, and without any obligation on the company to pay legal interest on such amounts (until the passage of thirty days from the date of the stockholders' vote) and with the right in Fritz to retain all dividends declared and payable prior to the date of the stockholders' vote to purchase;[27]

---

[26] Of course, any legal services undertaken only to benefit Dynan could not properly be charged against the company.

[27] Although the matter may be considered by the trial judge in entering judgment, it seems likely that any purchase of Fritz's stock will be effective on the date of the sale or sales and will not affect corporate action already taken.

and (6) the amount, if any, which, in the judge's discretion, the plaintiffs shall receive from the company in payment of their reasonable counsel fees and expenses, with the right in the judge's discretion (a) to receive further evidence bearing on the question of the company's obligation to pay counsel fees and expenses of the plaintiffs and (b) to retain jurisdiction to decide this matter of fees after the stockholders' action, if any, on the repurchase of Fritz's stock.

*So ordered.*