JAMES H. COOKE *vs.* LYNN SAND & STONE COMPANY
& another.[1]

No. 93-P-761.

Essex. May 11, 1994. - October 14, 1994.

Present: IRELAND, KAPLAN, & LAURENCE, JJ.

*Corporation*, Close corporation, Officers and agents, Stockholder. *Fiduciary*. *Contract*, Employment. *Practice, Civil*, Findings by judge.

This court concluded that a five-year executive employment contract between a closely held corporation and a director, stockholder and officer of the corporation, that was not negotiated at arms-length and was not disclosed to the other director-stockholders, was procured in violation of the director's fiduciary duties and was invalid and not enforceable. [496-501]

CIVIL ACTION commenced in the Superior Court Department on August 4, 1983.

The case was heard by *Peter F. Brady*, J.

*Robert M. Gault* for the defendants.

*Ralph D. Gants* (*Joseph F. Hardcastle* with him) for the plaintiff.

KAPLAN, J. The plaintiff, who was a director, officer, and shareholder of a closely held corporation, sued to enforce an employment contract naming the corporation as employer and himself as employee. We hold that the contract was procured by the plaintiff in breach of his fiduciary duties and is invalid and should be denied enforcement. The plaintiff's claim for alleged misrepresention also fails.

1. *The case.* Lynn Sand & Stone Company (Lynn Sand) was a family owned company in the business described as crushed stone and ready mixed concrete manufacturing. It was founded in 1918 by the plaintiff's grandfather, upon

---

[1]Trimount Bituminous Products Co.

whose death in 1930 the plaintiff's father, Theodore Cooke, took over. He retired in 1968 but served thereafter as chairman of the board of directors.

The plaintiff, after taking a postcollege degree of bachelor of science at the University of Colorado, joined the company with the title of chief engineer in 1955. He worked continuously there, first under his father, Theodore, then under Raymond F. Pybus, who was president in the years 1968-1975. In 1975, the plaintiff became president and assumed active management of the company. Robert Prosperi (not a member of the Cooke family) joined the company in the fall of 1975, later became a vice president, and undertook duties as the plaintiff's subordinate. The two men ran the day-to-day business, consulting from time to time with Theodore. The board of directors met annually to receive reports, but it took little action by way of guiding the progress of the business.

In 1981-1982 the board of directors consisted of Theodore, the plaintiff (son), Nancy Latta (daughter), Phillips Cooke (son), and Prosperi. Officers included: the plaintiff, president; Prosperi, Phillips, and Latta, vice presidents. Theodore owned about thirty-three percent of the company (and controlled more); the plaintiff and Phillips (with spouses) about twenty-two percent each; the rest was also substantially in family hands.

The plaintiff fixed his own salary largely in accordance with a formula described in the record and also set Prosperi's salary. They served at will without written contracts. In 1979, however, Prosperi asked for a contract, evidently to stabilize his position in the company, and company counsel wrote a five-year contract for him (the text does not appear). Theodore was told in advance about the contract; it was not presented to the board of directors for approval or ratification, but the members knew about it.

At this time there was in force a resolution of the board adopted at its annual meeting on April 30, 1979: "It was voted unanimously to authorize the president and vice presidents to sign contracts and documents in the name of the corporation when they believe such action to be in its best

interest." The same resolution was adopted at the annual meetings held on May 13, 1980, May 5, 1981, and April 22, 1982, but in the last case the authorization was only to the plaintiff and Prosperi by name.[2]

On June 10, 1981, the 1979 contract with Prosperi was superseded by a five-year contract written by him dating from January 1, 1981. It was signed for the company by the plaintiff, as president, and by Prosperi, as employee. The contract was not referred to the board. Prosperi may have had a rising impression that the company would be sold and felt that he needed solid protection against dismissal by the new owners.[3]

Similar considerations were at work in the plaintiff's mind on his own account. While Prosperi was in the course of preparing his 1981 contract, the plaintiff asked him to prepare a like five-year draft naming the plaintiff as employee (alike except for the salary and related terms); he intended to show the draft to Theodore to get his approval. Although retired, Theodore was still a power in the company by reason of family status and major stock ownership, besides his chairmanship of the board. In May, 1981, the plaintiff showed the draft to Theodore and discussed with him the advisability of the plaintiff's securing this contract for a term of years. Theodore's response was that the plaintiff should see what the others thought of it. Following the conversation, the plaintiff on May 26, 1981, circulated the draft contract to the board members. The draft left room for signature by Theodore, board chairman, for the company, as employer, and by the plaintiff, as employee. The plaintiff wrote that he was circulating the draft "at Dad's request in his capacity as Chairman of the Board of Directors. Please communicate your comments, approval or disapproval to him since this is a Board of Directors matter."[4] Nothing came of this. The

---

[2] It is not made clear how the change came to be made.

[3] The plaintiff mentioned that in practice Prosperi was receiving more salary than noted on the 1979 contract, and so adjustment of the contract was called for.

[4] The memorandum continued: "In the past I have waived having a contract although I would have been more comfortable with one. Since we are

plaintiff did not speak to the board members nor the members to him. A couple of weeks after May 26, Theodore, on a visit to the company office, bringing the draft with him, told the plaintiff that he was a member of the family and didn't need a contract. (It appears that no family member had ever had a written contract with the company.) The plaintiff said he threw the draft into the waste paper basket.

On July 2, 1982, a new employment contract for Prosperi to run afresh for five years from July 1, 1982, was drawn up by him and executed in the same form as the 1981 Prosperi contract.[5] It was not referred to the board of directors.

Shortly after the making of the 1982 Prosperi contract, the plaintiff instructed Prosperi to write a contract for him similar to the Prosperi contract (except for salary and related provisions). The plaintiff says that this was at Prosperi's suggestion; it was surely with a view to the possible takeover of the company. Prosperi complied, and the parties signed on September 3, 1982. Now the roles were reversed: Prosperi now signed as vice president on the part of the company, and the plaintiff signed as employee.[6]

This September, 1982, contract was not referred to the board, nor did the members know at the time that it existed. Neither the plaintiff's contract nor Prosperi's was mentioned in the notes to the year-end financial statements sent to board members and stockholders.

In early 1983, a number of possible purchasers of the business were heard from. The plaintiff proposed himself as a buyer (apparently on a stock purchase basis). Trimount Bituminous Products Co. (Trimount) had long been in touch with Theodore and Phillips Cooke, and on April 14, 1983, at a meeting attended among others by the plaintiff, Trimount

---

now actively engaged in exploring a 'taxes deferred' merger with Lonestar Industries (and perhaps some others in the future) I feel some urgency to have one. I have patterned the draft from the agreement the Company has with Bob Prosperi. The text of his is almost identical."

[5]The plaintiff explained the practical point as at note 3, *supra.*

[6]Some comparisons between the plaintiff's aborted 1981 draft contract (the equivalent of Prosperi's 1981 contract) and his undisclosed 1982 contract will be made below, note 14.

presented, in the form of an unsigned letter, a tentative offer
to acquire the substantial assets of Lynn Sand. On April 25,
1983, Milton Heffron and John Benevento made an offer to
purchase the shares of Lynn Sand. This, unlike the assets
offer, would involve the takeover by the purchaser of con-
tracts to which Lynn Sand was a party. So also it seemed
possible that the Trimount company might change to an offer
for shares.[7] At this point the plaintiff decided to disclose his
contract (and Prosperi's). The plaintiff had to be wary of let-
ting a sale go through with important information withheld
by him. Thus the plaintiff, probably on April 25, sent to the
prospective buyers, including, as he said, Trimount and Stu-
art M. Lamb, Jr., its president,[8] a "To Whom It May Con-
cern" memorandum informing them of the contracts and set-
ting out a bare sketch of the terms (the text was not
supplied). On April 29 the plaintiff sent a memorandum to
the members of the board of directors of Lynn Sand, enclos-
ing the memorandum previously sent to the prospective
buyers.[9]

Phillips Cooke testified that he spoke with Theodore
promptly after April 29. Both believed the plaintiff's pur-
ported contract was invalid. They communicated their opin-
ion to Lamb.

Perhaps a few days before May 4, Lamb met with the
plaintiff and they discussed the plaintiff's possible future in
case of a takeover. The plaintiff did not mention his contract.
Nor did Lamb refer to the contract. Lamb says he did not
know of it at the time, but this sometimes translates as a
reflection of his understanding that the contract was simply
void. Following the meeting with the plaintiff, Lamb sent the
plaintiff a letter dated May 4 inviting him to work in effect
for Trimount in the event of a "marriage" between the two
companies, but at a salary of $60,000 (no term beyond a

---

[7]This possibility may have been raised as early as the meeting on April
14.

[8]But see below Lamb's testimony about his lack of knowledge of the
plaintiff's contract.

[9]About the contracts, the memorandum said: "These were made for the
benefit of the company to keep our resumes 'off the street.' "

year mentioned), which was substantially less than the annual salary set in the plaintiff's contract. Lamb wrote to Theodore on May 9, saying that he had had a long talk with the plaintiff regarding his responsibilities if a marriage should take place and enclosing a copy of the May 4 letter. The letter to Theodore is in line with Phillips' testimony that from an early point in the negotiations with Lamb, which were conducted on the side of Lynn Sand by Theodore and Phillips, Theodore had impressed on Lamb that any buyer must find a place for the plaintiff in the new organization — the buyer to do this as a good faith or business understanding, not as a legal obligation.

Trimount on May 18, 1983, made a definite written offer for the purchase of the shares of Lynn Sand that might be tendered by the shareholders, provided the shares of Theodore and Phillips Cooke, amounting to a majority, were tendered.[10] The plaintiff learned of the offer that day. Theodore had his attorney, Mr. Richard Wyman, review the offer. Wyman drew up an "Addendum"[11] which became part of the offer on May 19 and was seen the same day by the plaintiff. The Addendum contained the following two items (other terms will be mentioned below):

> "1. Notwithstanding the provisions of paragraph 2, the parties agree as follows:

> "(a) Undisclosed liabilities which do not materially affect the net worth of Lynn shall not be deemed a breach of the stockholders warranties, representations and agreements under paragraph 2.

> "(b) The outstanding employment contracts between (1) Lynn and Robert Prosperi and (2) Lynn and James Cooke shall not be deemed undisclosed liabilities of Lynn, and Trimount recognizes that this agreement is subject to said contracts."

---

[10]The offer was signed by Lamb for Trimount and by Theodore and Phillips Cooke.

[11]Initialed by Lamb and Phillips Cooke.

All shares of the company were tendered. The plaintiff tendered his shares on May 27 at the stated offering price per share, a total of about $1.1 million.[12]

The plaintiff went to work under Trimount auspices after the takeover but refused to accept a monthly salary check based on an annual salary of $60,000 and insisted on performance of the 1982 contract. The impasse ended with a letter from Lamb terminating the relationship as of July 8, 1983.[13] (The Prosperi contract raised no problem as he was put to work immediately at an advanced salary without regard to the contract.)

2. *Analysis.* Transactions between insider and corporation are not wholly prohibited, but the insider, when challenged, has the task of showing that the deal was not in breach of his fiduciary obligations toward directors, stockholders, and corporation. See *Winchell* v. *Plywood Corp.*, 324 Mass. 171, 176-178 (1949); *Dynan* v. *Fritz*, 400 Mass. 230, 240-242 (1987). The fiduciary duty is especially exacting where the corporation is closely held, see *Donahue* v. *Rodd Electrolyte*

---

[12]On May 29, the plaintiff circulated a memorandum to the staff of Lynn Sand stating that he was extremely disappointed in members of his family; he had tried to purchase the company by a leveraged buyout but was "precluded" from doing so mainly by his father.

[13]In a letter of July 7, 1983, to the plaintiff, Lamb wrote that he had recently been furnished with a copy of the purported contract of 1982 between Lynn Sand and the plaintiff. Lynn Sand (now a subsidiary of Trimount) did not recognize the validity of the contract as its execution was not authorized by the board of directors. When Lamb met with Theodore in the latter part of 1982 to discuss the purchase of the company, he was told there was no such employment agreement. In meetings with the plaintiff in the latter part of 1982 and early in 1983 the plaintiff never mentioned the contract. After the plaintiff's April 29, 1983, memorandum to the board, Theodore and Phillips each stated to Lamb that the board had never been shown the contract, had never authorized it, and did not recognize its validity. At the time of the purchase of the shares owned by Theodore and Phillips, they and Jim Porath, the company's former accountant, requested that Lamb acknowledge his awareness of the plaintiff's claim to employment so that no charge could be made against the selling shareholders for failing to disclose a liability not shown on the year-end financial statement of the company. Lamb acknowledged the disclosure of the plaintiff's claim but not the validity of the claim. Lamb was still willing to continue the plaintiff's employment under the terms of the letter of May 4, 1983, but not under the alleged contract.

*Co. of New England*, 367 Mass. 578, 587-594 (1975), and, it may be added, in the case of a company with the history of Lynn Sand, a five-year contract with an insider executive would seem long-term and to be zealously scrutinized. See O'Neal & Thompson, O'Neal's Close Corporations § 6.06 (3d ed. 1987).

While details of the present transactions may be disputed, the main lines are quite clear, and provoke the following analysis and comments.

Entering upon a contract nominally with the corporation, the plaintiff was bound to make full contemporaneous disclosure of it to the other director-stockholders so that they might judge of the transaction and pass on it: the rule is that of the proverbial glass goldfish bowl. See *Wilson* v. *Jennings*, 344 Mass. 608, 616 (1962); *Dynan* v. *Fritz*, 400 Mass. at 242-243. Instead, the plaintiff deliberately withheld the information, saw to its exclusion from the financial statements rendered to the director-shareholders, and let the cat out of the bag (in fact only part of the cat, for the text of the contract was not disclosed) only when it would have been very hazardous for him to do otherwise. The plaintiff's secretiveness is especially to be deplored when one considers that he was on notice through his failed effort in 1981 that the idea of a contract was not popular and would probably have met opposition in 1982 as it did earlier.

An insider contract starts out suspect because of a question or doubt whether the interests of the corporation have had any true representation, whether the contract resulted from anything on the order of an arm's-length negotiation. See *Winchell* v. *Plywood Corp.*, 324 Mass. at 177-178; *Johnson* v. *Witkowski*, 30 Mass. App. Ct. 697, 709-710 (1991). Here it was Prosperi who signed for the corporation, but his situation was equivocal, to say the least. He was the plaintiff's subordinate, and he had been asked to copy the terms of the contract he had written for himself, when he had been seeking his own advantage, not the corporation's. There is no suggestion that any discussion took place between the plaintiff and Prosperi about the substance of the contract when

Prosperi might conceivably have spoken for the interests of the corporation. The swapping of roles, with the plaintiff endorsing Prosperi's contract, and Prosperi doing the same for the plaintiff, adds an element of unintended comedy rather inapposite to the discharge of the plaintiff's fiduciary responsibility.

The foregoing is enough to invalidate this contract, see *Dynan* v. *Fritz*, 400 Mass. at 242-243; *Globe Woolen Co.* v. *Utica Gas & Elec. Co.*, 224 N.Y. 483, 488-492 (1918), but we have to add that its essential soundness and fairness in the given business setting is much in doubt. Although there was no movement on foot in the company actually to displace the plaintiff as president, there was no disposition to ensure him a place for a period of five years. The plaintiff knew this from the episode of 1981, and the secret contract was an attempt to foist on the company a regime that the plaintiff's associates had rejected as a proposed business arrangement and, as far as appears, would continue to reject if given the chance. As to the specific terms of the contract, we set out in the margin some features that could hardly have survived an arm's-length business negotiation even if the five-year term were acceptable in principle.[14]

---

[14]As noted, the plaintiff's 1982 contract reproduced Prosperi's 1982 contract which Prosperi wrote as an improvement for himself over his 1981 contract. In turn, Prosperi's 1981 contract was the model for the plaintiff's proposed 1981 contract. To compare 1982 with 1981: The plaintiff was permitted to engage in outside employment for up to sixteen hours per week; if he exceeded this, the company could require him to terminate the employment. (The 1981 contract allowed only eight hours; if this was exceeded, the company could require the plaintiff to terminate the employment or could terminate the plaintiff's contract.) The plaintiff could exit his contract on thirty-days' notice; the company could terminate upon the plaintiff's death or resignation, in which event salary, etc., would cease; if the company terminated for any other reason, the plaintiff would be entitled to continued salary, etc. (The foregoing 1982 provision is odd indeed, with perhaps an unintended elision. The 1981 provision allowed the employee to exit on a sixty-days' notice. The company could terminate upon death, resignation, or fault of the employee, whereupon salary would cease; salary, etc., continued if termination occurred for other reasons.) The contract contained no noncompetition clause. (The 1981 contract had such a clause. Both instruments had a general clause against communication of

The secret 1982 contract cannot be validated by reference to the resolution of the board of directors, adopted annually, to authorize the president and a vice president to sign contracts in the name of the corporation. The resolution was boilerplate. Quite naturally it looks to contracts by the corporation with third parties, not with an insider. This was the view taken by the plaintiff's fellow directors who considered the contract to be void[15] (the view communicated to Trimount's president). The plaintiff himself acquiesced in the limited scope of the resolution; when he submitted the 1981 draft contract to board members for their "approval or disapproval" he said, "this is a Board of Directors matter" — not a matter for decision by the plaintiff and Prosperi.[16]

There has been argument that the Addendum to the letter offer of May 18, 1983, initialed by Lamb and Phillips Cooke, might serve to make the contract enforceable. There is nothing in the Addendum that represents a ratification by Lynn Sand of the contract and no such action was ever taken by the board of directors or the shareholders — the votes, of course, would not have been there. Nor did the Addendum represent any adoption or assumption of the contract by Trimount. As noted above, paragraph 1(b) speaks of the contract as "outstanding" and states that the agreement is "subject" to it. There is no language of adoption or assumption, and the paragraph is readily understood as acknowledging that a claim may be asserted under the contract and that Trimount has been made aware of it (so Lynn Sand's selling shareholders may not be charged later with concealment). For "subject to" as words of limitation, creating no affirmative contractual obligations, see *Houston Lighting & Power*

---

confidential matter.) It should be said that the agreements look rather homespun and are poorly drafted.

[15]Nancy Latta joined with Theodore and Phillips, as shown in her deposition.

[16]If, as we suggest, the resolution did not empower president-vice president to make a contract with an insider, then the 1982 contract appears invalid unless ratified by the board of directors, and a separate showing of breach of fiduciary duty may be considered redundant although strongly supportive of the result.

*Co.* v. *Atchison, Topeka & Santa Fe Ry.*, 863 S.W.2d 141, 146 (Tex. App. 1993); *S.L. Nusbaum & Co.* v. *Atlantic Va. Realty Corp.*, 206 Va. 673, 679 (1966).[17] A contrary interpretation, that Trimount was accepting the plaintiff's five-year contract, is lexically possible in the abstract but in the circumstances of this case is unlikely to the point of being incongruous. There is no basis for a belief that Trimount (Lamb) would intend any such interpretation or result. Nor would the plaintiff have understood the paragraph in such a sense. Theodore disapproved of a company contract with the plaintiff and had been kept in ignorance of the purported contract; in fact he repudiated it. The plaintiff could hardly suppose that Theodore or Phillips would have prevailed on Lamb to embrace the contract liability as part of the take-over. (We note, by the way, that the Addendum was written by Theodore's attorney who presumably knew and would respect Theodore's views.)[18]

*Regarding the judge's findings.* The judge's findings can be briefly characterized. They were bland, general rather than specific in style, and treated the transactions to the extent described as routine and correct. The various elements that we have set out above, putting the plaintiff's fulfilment of his fiduciary responsibilities much in question, were in substance ignored in the judge's findings; he said simply that there was no breach of duty. In our view, the findings of fact were clearly erroneous (in the sense of not being adequately

---

[17]The usage of "subject to" as acknowledging a possible or contingent liability is repeated in paragraph 1(d) of the Addendum referring to certain litigation pending against Lynn Sand.

[18]The plaintiff claimed that the Addendum was in effect a false statement on which he relied in selling his shares. This misrepresentation count falls with the other.

As we hold there is no liability, we do not discuss the award of damages. The plaintiff was allowed salary and other benefits for the five years; mitigation was quite small. The judgment was $420,437.37 in principal amount plus interest of $470,887.

responsive to the record) and the conclusions of law were un-warranted and incorrect.[19]

*Judgment reversed.*
*Judgment for the defendants.*

---

[19]Incidentally, the judge did not rule on the misrepresentation count.