**In re P.J. KEATING COMPANY, Keating Sports Group, Inc., Roofblok Limited, Debtors.**

**Bankruptcy Nos. 93–41350–JFQ to 93–41353–JFQ and 93–41356–JFQ.**

United States Bankruptcy Court, D. Massachusetts.

June 17, 1994.

Jack R. Pirozzolo, Willcox, Pirozzolo &
McCarthy, Boston, MA, for Martha Moore
and Joan Lavoie.

John Monaghan, Sherburne, Powers &
Needham, Boston, MA, for Lewis Troxell.

Daniel C. Cohn, Cohn & Kelakos, Boston,
MA, for Oldcastle, Inc.

William R. Baldiga, Brown, Rudnick,
Freed & Gesmer, Boston, MA, for Fleet
Bank of N.Y.

Gayle P. Ehrlich, Sullivan & Worcester,
Boston, MA, for Robert P. Keating Family.

Stephen Wald, Craig and Macauley, Bos-
ton, MA, for Safety Fund National Bank.

Steven D. Pohl, Brown, Rudnick, Freed & Gesmer, Boston, MA, for Keating Sports Group, Inc.

Charles R. Dougherty, Hill & Barlow, Boston, MA, for P.J. Keating Co.

Mary T. Sullivan, Segal, Roitman & Coleman, Boston, MA, for Mass. Laborers' Benefit Funds.

### FINDINGS AND CONCLUSIONS SUPPORTING CONFIRMATION OF THREE PARTY PLAN

JAMES F. QUEENAN, Jr., Chief Bankruptcy Judge.

The court has conducted a lengthy evidentiary hearing to consider confirmation of either of two competing plans of reorganization. One plan is proposed by P.J. Keating Company (the "Debtor"), whose management is selected by its Class A shareholders. The other plan (the "Three Party Plan") is proposed by members of the Robert P. Keating family (owners of the Debtor's Class B shares), Oldcastle, Inc. (a competitor of the Debtor) and Fleet Bank of New York (the Debtor's lender). Set forth here are the court's findings of fact and conclusions of law.

### I. FACTS

Founded in 1921 by Patrick J. Keating, a forebear of the present stockholders, the Debtor is engaged in several lines of business. Its core business is the production and sale of bituminous concrete, known as "blacktop", which it manufactures in plants located in Lunenberg, Massachusetts and Dracut, Massachusetts. It also operates quarries, stone crushing plants, and ready-mix concrete plants. Until a postfiling merger with the Debtor on October 15, 1993, Keating Materials Corp. was a subsidiary of the Debtor and also operated a quarry, a bituminous concrete plant and a crushed stone production facility. Roofblok Limited, another subsidiary of the Debtor, markets wind-resistant concrete blocks used as roof ballast. It owns the patents and technology for this product. It licenses manufacturing rights to others, and sells the product through a nation-wide system of sales representatives. Keating Sports Group, Inc., also a subsidiary, formerly owned a Double A baseball team which it sold before filing its chapter 11 petition. It presently conducts no business. Immediately prior to the confirmation hearing, I entered an order substantively consolidating the estates of Keating Sports Group, Inc. and P.J. Keating Company.

The Debtor and its subsidiaries have had a checkered history of profits and losses. During 1985 to 1988, they enjoyed profits ranging from $1 million to $4 million. In the 1989—1992 period, they suffered operating losses as high as $6 million, but were aided by gains on the sales of the baseball club and a New York subsidiary which produced aggregates. They enjoyed a $1.7 million profit in 1993, but that was largely due to a one-year arrangement under which the Debtor wholesaled all its bituminous concrete production to a competitor.

The Debtor has obviously suffered from the recession in the construction industry that descended upon Massachusetts in 1988 and continues to a significant degree even to today. To make matters worse, the Commonwealth of Massachusetts and many municipalities have reduced their spending on road repairs and improvements. The Debtor's financial picture has also been exacerbated by its large capital spending program of the late 1980s. This substantially increased its fixed costs. Some of these expenditures, for example the investment in a new concrete plant in Orange, were in hindsight a mistake.

The Debtor's outstanding shares of common stock are evenly divided between members of the family of Robert P. Keating, who hold Class B shares, and members of the family of Paul J. Keating, II, who hold Class A shares. Robert P. Keating was an uncle of Paul J. Keating, II. State court litigation between the two families resulted in a settlement under which the holders of Class A shares obtained the right to elect a majority of the board of directors, and the holders of Class B shares were restricted to electing the rest of the board. As a result, Paul J. Keating, II and his family now control the Debtor, and the Robert P. Keating family takes no part in management of the Debtor

outside of the family's minority board position held by Robert's son, John J. Keating.

In their settlement of the state court litigation, the parties obligated the Debtor to redeem the shares of the Robert P. Keating family no later than August 7, 2000 for the sum of $5.5 million, with 20% payable in cash and the balance payable, with interest, over five years. Pursuant to further terms of the settlement agreement, the Debtor entered into consulting agreements with both Robert P. Keating and his son, John J. Keating. The latter agreement obligates the Debtor to pay John J. Keating $41,000 per year until the earlier of his death or the Debtor's purchase of his stock. The Debtor's agreement with Robert P. Keating, which involved annual payments of $150,000 per year, terminated on Robert's death last year. Under a 1985 agreement, the Debtor is obligated to pay Robert's widow, Jacquelyn Keating, $75,000 per year through the year 2013.

Fleet Bank of New York ("Fleet") holds a security interest in virtually all the Debtor's assets to secure its debt of about $20.5 million. The chapter 11 filings of the Debtor and its subsidiaries were precipitated by Fleet offsetting the Debtor's large deposit account against the loan debt.

The Three Party Plan proposes the following:

(i) immediate payment in full, with interest, of all allowed unsecured claims except the claims of the Robert P. Keating family;

(ii) immediate payment to Fleet of $15.3 million on its $20.5 million secured claim;

(iii) cancellation of all shares of both classes of the Debtor's capital stock;

(iv) in consideration of such cancellation, transfer to the Class A shareholders of:

(a) the stock of Roofblok Limited and two inactive nondebtor affiliates, and

(b) 57 acres of industrial land located on Jungle Road, Leominster, Massachusetts;

(v) waiver by the Class B Shareholders of the right to receive any property designated as consideration for the cancellation of their stock; and

(vi) issuance by the Debtor of new common stock to the proponents of the Three Party Plan in the following percentages: 45% to Oldcastle, Inc. in consideration of a cash capital contribution of $6,000,000, 35% to the Robert P. Keating family members in part payment of their various claims, and 20% to Fleet as further payment on its secured claim;

(vii) payment of $75,000 per year for seven years to members of the Robert P. Keating family in further payment of their claims; and

(viii) sale of the Debtor's concrete business.

Under the terms described later, Oldcastle, Inc. ("Oldcastle") has an option to purchase the stock interest of Fleet and the Robert P. Keating family, and, if it does not, it is subject to a put. In addition, Oldcastle is obligated to loan the reorganized Debtor $9 million to provide it with sufficient funds to make the plan payments.

The Debtor's Plan proposes the following:

(i) assumption of all redemption and deferred compensation obligations owed to members of the Robert P. Keating family;

(ii) assumption of all deferred compensation obligations owed to members of the Paul J. Keating, II family;

(iii) modification of the terms of the debt owed to Fleet so that it is payable over ten years with interest at 1¾% above Fleet's prime;

(iv) curing of defaults under other secured claims;

(v) payment in full, with interest at 6%, of all other unsecured claims, some of whose holders have consented to payments being deferred until the end of 1994;

(vi) retention by the Class A and Class B stockholders of their stock interests.

The foregoing presents the basic factual picture. Additional findings are set forth in discussions of the various legal issues.

## II. CONFIRMABILITY OF THREE PARTY PLAN

The Class A interests having declined to accept the Three Party Plan, the plan must meet the "fair and equitable" requirement imposed by section 1129(b) as a protection

for nonconsenting equity interests. With respect to equity interests having no rights of redemption or liquidation preference, such as the Class A shares, this test is satisfied if the holders receive or retain property equal to the value of their interests *or* if no interests junior to their interests receive or retain any property. 11 U.S.C. § 1129(b)(2)(C) (1988 & Supp. IV 1992). As shall be seen from its legislative history, the fair and equitable rule also requires that no creditor be paid more than in full. I treat each of these elements of the rule separately.

### A. *Section 1129(b)(2)(C)(ii)—Absence of Any Junior Interest Receiving or Retaining Property.*

Section 1129(b)(2)(C)(ii) provides:

(ii) the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property.

11 U.S.C. § 1129(b)(2)(C)(ii) (1988 and Supp. IV 1992). There is no interest junior to these Class A shares. Thus, paragraph (ii) is satisfied. *See* H.R. 95–595, 95th Cong., 1st Sess. (1977) 413; 124 Cong.Rec. 11105 (daily ed. Sept. 28, 1978).

Because the test under section 1129(b)(2)(C) is an alternative one, satisfaction of paragraph (ii) makes it unnecessary for the plan to comply with the mandate of paragraph (i) that holders of interests (having no rights of redemption or liquidation preference) receive or retain property of a value equal to the value of such interests. The parties have nevertheless tried and argued the case under this branch of the statute, so I turn to it.

### B. *Section 1129(b)(2)(C)(i)—Payment of Value of Class A Interests.*

The alternative mandate of section 1129(b)(2)(C)(i) is that each holder of Class A interests "receive or retain on account of such interest property of a value, as of the effective date of the plan, equal to ... the value of such interest; or...." 11 U.S.C. § 1129(b)(2)(C)(i) (1988 & Supp. IV 1992).

■ Valuation of stock interests is truly an adventure in Alice in Wonderland, which

Congress in its *infinite* wisdom made necessary only with respect to a proposed cramdown of claims or interests. The parties agree, and I concur, that the value of the Class A common stock interests is one-half the excess of the "reorganization value" of the Debtor's assets over its liabilities as they exist following confirmation. They also agree the value of assets depends largely upon projections of future cash flow from operations.

In the present case, there are two plans proposing operations under different managements and with different capital and debt structures. Under the Three Party Plan, moreover, the Debtor's ready-mix concrete business would be sold, whereas there is no proposal for such a sale under the Debtor's plan. Thus the projections of cash flow, and hence stock value, are quite different under each plan. It seems "fair and equitable" that the value of the Class A interests be based upon projections of future cash flow from operations under the Debtor's plan. That is the plan proposed by management selected by the holders of Class A stock. Indeed, Paul J. Keating, II is both president of the Debtor and trustee of the trust holding all the Class A shares. The parties do not dispute this point.

The opposing experts who testified on value, both partners in Big Six accounting firms, employed largely the same approach. They projected cash flow through the years 2000 and 2003 and discounted the cash stream to present value, using discount rates of 15% and 16.6%. To that figure they added: (i) the value of the business at the end of the projection period, discounted to present value, plus (ii) the value of assets not needed in the projected operations. They computed the value of assets at the end of the projection period through the simpler (and formerly traditional) method of multiplying an earnings base by a capitalization factor. A principal difference between the two experts was that the Debtor's expert made numerous adjustments to the Debtor's historical figures to reflect what he perceived to be different conditions that would be present in the operations of the reorganized Debtor.

The Debtor's expert believed the reorganization value of the assets is between $36 million to $45 million, depending on whether the Debtor qualifies for bonding on public jobs. When these sums are reduced by the Debtor's present liabilities of about $30 million, it means that the Debtor's stock, both Class A and Class B, is worth from $6 million to $15 million. The expert for the Three Party Plan opined at an asset reorganization value of $22.28 million, so that he believed the stock has a negative value of about $8 million. No useful purpose would be served by a detailed analysis of this conflicting testimony. It suffices to say I find the valuation urged by the proponents of the Three Party Plan is closer to reality. This is largely because I conclude, for the reasons set forth later, that the Debtor's plan is not feasible. The Debtor's plan will likely result in the Debtor's assets being liquidated at prices insufficient to pay all its liabilities. I find the reorganization value of the assets to be $27 million. Because the debts exceed this figure, the Class A shares have, in theory, no value.

■ This does not mean, however, that the Debtor's Class A stock is truly valueless. The ability to control a company of this size, even one apparently heading for liquidation, is worth something. I conclude the value of the Class A shares is no more than $500,000. I also find the Jungle Road property and the shares of Roofblok Limited to be distributed to the Class A holders has a total value of $2 million. The Three Party Plan therefore provides the holders of Class A shares with property having a value in excess of the value of their shares. The paragraph (i) test is met.

### C. *The Prohibition Against Creditors Being Paid in Excess of Their Allowable Claims.*

Section 1129(b)(2) says the "fair and equitable" mandate with respect to a nonaccepting class of interests "includes" the requirements set forth in subsection (C). The term "includes" is not limiting. 11 U.S.C. § 102 (1988 & Supp. IV 1992). An uncodified aspect of the fair and equitable rule governing the cram down of interests is that no class of

creditors be paid more than in full. H.R.Rep. No. 95–595, 95th Cong., 1st Sess. (1977) 414, 1978 U.S.Code Cong. & Admin.News, 5787, 6370.

The Debtor and the Class A shareholders contend the claims held by Fleet and the family of Robert P. Keating will be paid more than in full through receipt of their respective stock interests of 20% and 35% in the reorganized Debtor, and through the additional consideration being paid the Robert P. Keating family in the form of seven annual payments of $75,000.

The precise amount of Fleet's claim has not been adjudicated. Being fully secured (as I later find it is in discussion of the best interests test), the claim is enhanced by accruing interest, attorneys' fees and other charges allowed under the loan documents. 11 U.S.C. § 506(b) (1988 & Supp. IV 1992). The claim has recently been reduced by a payment on the note received in the sale of the ball club, which Fleet held as collateral. For present purposes, I estimate the Fleet claim at about $20.5 million.

Computation of the claims held by the Class B shareholders is also complex. They hold the following claims: (i) the right to receive installment payments on the $5.5 million stock redemption price, plus interest, commencing August 7, 2000, (ii) John J. Keating's right to receive $41,000 per year under a consulting agreement requiring little in the way of services, (iii) a $175,000 claim of Robert P. Keating's wife under a 1965 deferred compensation agreement, (iii) another claim of Robert's wife under a 1985 agreement requiring twenty annual payments of $75,000 per year commencing January 2, 1994.

The Three Party Plan's expert computes the present value of the contractual rights of the Class B shareholders to be $3.122 million. I accept this. The claims should not be further discounted for this purpose to reflect the risk of nonpayment under the Debtor's plan. They are still allowable claims.

Whether the Three Party Plan proposes excessive payment to Fleet or Robert's family depends of course upon the value of the stock interests they are designated to receive

in the reorganized Debtor. Unlike the valuation of the Class A interests, the 35% and 20% interests to be owned by Robert's family and Fleet are necessarily valued in the context of the Three Party Plan, from which they emanate.

Under the Three Party Plan, the Debtor is to receive from Oldcastle a $6 million capital injection and a $9 million loan. John J. Keating, a Class B shareholder, would become the chief operating officer of the reorganized Debtor, responsible for day-to-day operations. He is a competent young man. Having worked for the Debtor until he was fired a few years ago, he has knowledge of the Debtor's operations. The Debtor will be under the overall control and management of Oldcastle, which by contract will have the right to designate a majority of its directors. Oldcastle is in the same business as the Debtor, with operations in the northeast as close to the Debtor as southern New Hampshire. Oldcastle is a well-funded subsidiary of CRH plc, a large supplier of building materials which is based in Ireland and has operations throughout much of Europe and the United States. I conclude the reorganized Debtor will be in existence as a profitable business at all relevant times under the stock purchase agreement among Oldcastle, Fleet and Robert's family.

The parties' stock purchase agreement gives Oldcastle the option, in 1999, to buy Fleet's 20% interest and the Robert P. Keating family's 35% interest. The option price is based on an overall value of the Debtor equal to 6½ times the Debtor's earnings before interest and taxes, averaged over three years, *plus* the Debtor's cash or cash equivalents, and *less* the sum of (i) $10 million, and (ii) the debt then owed by the Debtor to Oldcastle. If Oldcastle does not exercise its purchase option in 1999, the family and Fleet have the right to require Oldcastle to purchase their stock at the option price.

I conclude it is likely these minority interests will be sold under either Oldcastle's call rights or Fleet's and the family's put rights. Based on the usual valuation techniques, the formula price is a bargain, so it is likely Oldcastle will exercise its purchase option. And if it does not, it is likely the family or Fleet will exercise their put rights. They want cash, not an illiquid investment.

The stock of Fleet and the family should not be valued based upon Oldcastle's payment of $6 million for its 45% interest. The existence of the option places a ceiling on the stock's value.

The expert for the Three Party Plan testified the present value of the family's rights under the Oldcastle agreement, plus the family's right to receive $75,000 per year for the next seven years, is $1.128 million. I accept that. This means that the Three Party Plan proposes to pay the Robert P. Keating family $1.128 million on claims allowable in the sum of $3.122 million. That is not overpayment.

Nor is Fleet being overpaid. Its 20% stock interest is obviously worth less than the family's 35% stock interest. This value is far less than the remaining $5.2 million balance of its secured claim.

### D. *Absence of Discriminatory Treatment*

The Debtor and Paul J. Keating, II complain the Three Party Plan "discriminates unfairly," within the meaning of section 1129(b)(1), against the Class A shareholders because it treats the Class B shareholders better. But the plan does so only in their capacity as creditors, not shareholders. Moreover, there would be discriminatory treatment only if the value going to Class B exceeds the amount of their claims plus the value of their stock. It falls far short of doing that.

### E. *Section 1129(a)(10)*

Section 1129(a)(10) provides this confirmation requirement: "If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by an insider." 11 U.S.C. § 1129(a)(10) (1988 & Supp. IV 1992).

Because the Three Party Plan treats the claims of Robert's family as being resolved under a compromise, Fleet's claim is arguably the only claim that is impaired under the plan. The Debtor contends Fleet's ac-

ceptance of the plan does not comply with subsection (a)(10) because, as a co-proponent, Fleet is an "insider." Admitting that Fleet does not meet the section 101(31) definition of an insider, the Debtor asks the court to go beyond that definition because Congress had in mind only a plan proposed by a debtor. Even if this were so, I would decline to so twist a statutory definition. In any event, in light of the Congressional sanction for third party plans, there is no reason to believe Congress had such a circumscribed notion of the plan proposal process.

### F. Best Interests of Creditors Test

Section 1129(a)(7)(A)(i) of the Code requires that each holder of an interest (or claim) of an impaired class either accept the plan or "retain under the plan on account of such ... interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date." The Debtor contends a chapter 7 liquidation would provide more value to the Class A stockholders than the value of the stock and real estate being distributed to them. I disagree. The asset values obtainable in chapter 7 would come to only about $22 million, barely enough to cover Fleet's all-asset secured claim of approximately $20.5 million. The unsecured claims allowable in chapter 7, including additional administrative expense claims and taxes, would total about $20 million. A chapter 7 liquidation would clearly leave nothing for stockholders.

The testimony of the Debtor's expert on liquidation value contained a number of flaws. Among them was excessive optimism on the prices obtainable from the sale of assets and a failure to take into account the operational losses a chapter 7 trustee would most likely incur in attempting to sell the Debtor's various businesses as going concerns.

### G. Other Confirmation Requirements

The other confirmation requirements of section 1129 have not been contested. I find the Three Party Plan complies with all of them, including of course the mandate of feasibility under section 1129(a)(11).

### III. CONFIRMABILITY OF DEBTOR'S PLAN

The Debtor's plan, in contrast, is neither feasible nor in compliance with the requirements for a cramdown of Fleet's secured claim.

### A. Feasibility

■ With respect to a nonliquidating plan such as the Debtor's, I must find "[c]onfirmation of the plan is not likely to be followed by liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan...." 11 U.S.C. § 1129(a)(11) (1988 & Supp. IV 1992). To the contrary, I find that under the Debtor's plan there is a likelihood the Debtor will be liquidated no later than the year 2,000, when the redemption rights of the Class B shareholders ripen, and probably earlier.

The Debtor now has a cash fund of about $4 million, largely as the result of failing to pay Fleet's accruing interest and having been able to operate at a profit in 1993 by wholesaling all its bituminous concrete production to a competitor. But its business is seasonal, making few demands for expenditures in the winter and early spring. The Debtor will soon need its cash. Yet it has no commitment for ongoing financing. Recognizing this, it obtained the agreement of a number of creditors to defer full payment of their claims, at 6% interest, until late 1994.

The Debtor has historically sold much of its bituminous concrete production, its core business, to the Commonwealth of Massachusetts and local cities and towns. It has two problems on this score with respect to the 1994 season. First, the legislature has not yet passed the bond bill needed to finance state jobs. Even if that bill is passed later this month, as the Debtor predicts, the 1994 season is off to a very slow start. And there is no assurance that if the bill is passed, the state will not use some of the funds for other purposes, as it has in the past. Second, by its own admission, the Debtor will have difficulty obtaining public jobs because its finan-

cial problems impair its ability to get surety bonds required for public contracts. Moreover, unlike some of its competitors, the Debtor has reduced its paving operations, so it will have to depend largely on other paving contractors getting public jobs and using the Debtor as a supplier.

The Debtor's huge investment in fixed assets will continue to be its albatross. Its fixed expenses are too high. And adding to the Debtor's expenses will be the increased interest rate I require on the Fleet debt, as discussed below.

If by chance the Debtor is able to struggle through to the year 2000, it then must face the need to commence payments on the $5.5 million redemption price of the Class B shares. These payments are pure stockholder distributions, with no *quid pro quo* for the Debtor. If the Debtor is still in business then, the redemption payments will almost surely sink it.

## B. *Cramdown of Fleet's Claim*

The Debtor proposes, over Fleet's objection, that the Fleet claim (now due in full) be paid over ten years. Interest would be paid at 1¾% over Fleet's prime, payable monthly in arrears. This rate would replace the present contract rate of 1½% above prime contained in the parties' loan agreement of March 20, 1992. Principal payments are to be made in quarterly installments, commencing December 1, 1994, as follows: 1994—one quarterly installment of $250,000, 1995— quarterly installments of $125,000, 1996— quarterly installments of $250,000, 1997– 2004—quarterly installments of $375,000. On December 31, 2004 the entire balance would become due.

The Debtor proposes that Fleet retain its security but that the Debtor's covenants under the present loan documents be largely eliminated. The parties' existing loan agreement contains various affirmative covenants and a number of negative covenants. The Debtor agreed, for example, not to exceed specified amounts for capital expenditures, not to allow its net worth to be below specified figures (which it now is), and not to allow earnings during 1992 to be less than specified

amounts. The Debtor would eliminate this covenant.

Most important, the March 20, 1992 loan agreement prohibited the Debtor from redeeming any of its capital stock without Fleet's prior written consent. On August 7, 1992, as part of the settlement of pending litigation between the holders of the two classes of stock, the Debtor signed the stock redemption agreement with the Class B shareholders. The Debtor did seek Fleet's permission to make this commitment. Fleet did not take this kindly. The Debtor would also eliminate the redemption covenant.

I turn first to the interest rate issue.

## 1. *Interest Rate*

■ The interest rate in a secured claim cramdown must be sufficient to give the holder of the claim "deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property." 11 U.S.C. § 1129(b)(2)(A) (1988 & Supp. IV 1992).

Most courts believe the selection of a proper interest rate must take into account the risks involved. *E.g., Prudential Ins. Co. v. Monnier Bros. (In re Monnier Bros.),* 755 F.2d 1336 (8th Cir.1985); *In re Southern States Motor Inn,* 709 F.2d 647 (11th Cir. 1983); *In re Guilford Telecasters, Inc.,* 128 B.R. 622 (Bankr.M.D.N.C.1991); *In re Landmark at Plaza Park, Ltd.,* 7 B.R. 653 (Bankr. D.N.J.1980). Some seem to go further and look only to the rate that would be charged in the market for such a coerced loan. *See, e.g., In re Hardzog,* 901 F.2d 858 (10th Cir. 1990). The difficulty with the latter approach is that no market exists for the typical cram down loan we have here—a forced loan to a borrower with a history of financial problems that is secured by collateral having a liquidation value barely enough to cover the loan. Courts have made note of this reality. *See In re Montgomery Court Apartments,* 141 B.R. 324 (Bankr.S.D.Ohio 1992); *In re Oaks Partners, Ltd.,* 135 B.R. 440 (Bankr. N.D.Ga.1991); *In re Computer Optics, Inc.,* 126 B.R. 664 (Bankr.D.N.H.1991).

To reflect the risk, the rate should take into account all aspects of the proposed forced loan, including rates for uncoerced loans of this general type, the value of the collateral and the Debtor's prospects. It also makes sense in the present case to take into account the fact that the Debtor and Fleet agreed to a rate of 1½% above prime only a little over two years ago, when the Debtor had a recent history of having operating losses. *See In re Monnier Bros.*, 755 F.2d at 1339–40. But the Debtor's dim prospects weigh heavily against it.

Having all this in mind, and without taking into account the redemption problem discussed below, I conclude the appropriate rate is 4% above Fleet's prime. With that prime now at 7½%, this means a present rate of 11½%. That would require about $500,000 more of annual interest than the Debtor proposes to pay.

### 2. *Loan Covenants*

The covenants to be included in the loan documents of a cramdown need not precisely track the covenants in the parties' existing loan agreement. *In re Western Real Estate Fund, Inc.*, 75 B.R. 580 (Bankr. W.D.Okla.1987); *In re Coastal Equities, Inc.*, 33 B.R. 898 (Bankr.S.D.Cal.1983). Yet the covenants should not leave the lender so bare of protection as to greatly increase the risk or require a corresponding increase in the interest rate.

It might be appropriate to modify the existing covenants between the parties dealing with matters such as net worth, earnings and capital expenditures. I express no opinion on that. The covenant prohibiting stock redemption, however, is another matter. Elimination of this would require Fleet to sit back and do nothing as most of the $5.5 million redemption price, plus interest, is paid out without the Debtor receiving value in return and while a large balance is still due on Fleet's loan. That is hardly fair and equitable. The Debtor's elimination of this covenant is sufficient alone to prevent confirmation.

### IV. LIABILITY OF PAUL J. KEATING, II ON HIS GUARANTY

Section 10.10 of the Three Party Plan states conversion of a portion of Fleet's claim into stock "shall, for purposes of determining the liability of any other entity for such Claim, be deemed payment of such Claim only in the amount of the value of such stock, subject to the Stockholders' Agreement, on the Effective Date...." This provision is obviously designed to aid Fleet in its claim against Paul J. Keating, II under his guaranty of the Fleet loan. The provision is improper. Rights under the guaranty are not now before me. Because of this my finding of the value of the stock to be received by Fleet has no *res judicata* effect upon rights under the guaranty. Moreover, another fact finder, even on this same evidence, might well find the stock has a greater value than I ascribe to it. The confirmation order issued today therefore strikes this portion of section 10.10.

### V. CONCLUSION

I have accordingly issued an order today confirming the Three Party Plan, with the exception noted, and denying confirmation of the Debtor's plan.

### ORDER CONFIRMING THREE PARTY PLAN AND DENYING CONFIRMATION OF DEBTOR'S PLAN

The court has conducted a lengthy evidentiary hearing to consider confirmation of either of two competing plans of reorganization. One plan is proposed by P.J. Keating Company (the "Debtor"), whose management is selected by its Class A shareholders. The other plan (the "Three Party Plan") is proposed by members of the Robert P. Keating family (owners of the Debtor's Class B shares), Oldcastle, Inc. (a competitor of the Debtor) and Fleet Bank of New York (the Debtor's lender).

Having today issued an opinion containing findings and conclusions with respect to the two plans, in accordance with that opinion it is hereby

ORDERED that:

1. Confirmation of the Debtor's plan is denied.

2. The court hereby strikes the provision in section 10.10 of the Three Party Plan dealing with the effect that conversion of a portion of the claim of Fleet Bank of New York into stock of the reorganized Debtor has upon the liability of any other entity for such claim.

3. As so modified, the Three Party Plan is confirmed.