**In re P.J. KEATING COMPANY, Keating Sports Group, Inc., Roofblok Limited, and Keating Materials Corp., Debtors.**

Bankruptcy Nos. 93–41350–
JFQ to 93–41353–JFQ.

United States Bankruptcy Court,
D. Massachusetts.

April 12, 1995.

See also, 168 B.R. 464.

---

Gayle P. Ehrlich, Sullivan & Worcester, Boston, MA, for Jacqueline Keating, et al.

A. Davis Whitesell, Cohn & Kelakos, Boston, MA, for Oldcastle, Inc., P.J. Keating Co.

Steven D. Pohl, Brown, Rudnick, Freed & Gesmer, Boston, MA, for Fleet Bank of NY.

Chalres A. Dale, Hanify & King, Boston, MA, for Paul J. Keating, II.

## DECISION ON CLAIMS OF PAUL J. KEATING, II

JAMES F. QUEENAN, Jr., Chief Judge.

This is a dispute over claims for reimbursement and indemnification of legal expenses and claims for employment benefits consisting of severance pay, vacation pay and medical expense coverage. At issue is the existence of these employment benefits as an incident to the claimant's employment, as well as application of a by-law indemnifying officers and directors for their legal expenses. Some of the claims are being asserted through amendments made after the bar date; the permissibility of these late amendments is also disputed. A trial having been conducted, I set forth here my findings of fact and conclusions of law.

P.J. Keating Company (the "Debtor") filed its chapter 11 petition on May 12, 1993. The court fixed February 28, 1994· as the final date for the filing of claims (the "bar date"). Having received notification of the bar date, Paul J. Keating, II (the "Claimant") filed the following five proofs of claim on the dates indicated: (i) $61,826.81 claim for indemnification and reimbursement of legal expenses (February 28, 1994), (ii) claim in an "unknown" amount, described as partially contingent and partially noncontingent, for severance pay, vacation pay and medical benefits (February 28, 1994), (iii) $161,032.78 amended claim for indemnification and reimbursement of legal expenses (July 11, 1994), (iv) $273,461.54 amended claim for severance pay, vacation pay and medical benefits (July 11, 1994), and (v) $248,532.78 amended claim

for indemnification and reimbursement of legal expenses (November 10, 1994).

## I. LEGAL EXPENSE CLAIMS

### A. *State Court Litigation*

Of the $248,532.78 second amended legal expense claim, $153,532.78 is the result of state court litigation in which the Claimant paid or incurred legal expense to the following law firms and attorneys: Bowditch & Dewey—$41,000 (paid) and $84,389.44 (incurred); Widett, Slater & Goldman—$5,399.14 (paid); Jerome Gotkin, Esq.—$3,510.00 (paid); Robert Lange, Esq.—$2,305.15 (paid); James Donnelly, Esq.—$4,151.17 (paid); and Friedman & Atherton—$14,816.53 (incurred). The proliferation of attorneys and law firms is largely the result of an attorney changing law firms or the Claimant changing attorneys. James Donnelly, Esq. served as a master appointed by the court to perform conciliatory and other functions exclusive of fact finding.

At the time of the state court litigation, which was commenced on June 14, 1990, the Debtor had three classes of stock pursuant to a stockholders' agreement dated July 18, 1985. Class A shares were owned or controlled by the Claimant and members of his family. Class B shares were owned or controlled by the Claimant's cousin, John J. Keating, John's father, Robert P. Keating, and members of their families. Each class could each elect two directors. A few Class C shares were owned by the Claimant. The Class C shares had restricted but significant voting rights. If a deadlock occurred among the Debtor's four directors, Class C could elect a temporary fifth director to cast a tie-breaking vote. The Claimant thus had effective control of the Debtor. At the time of the state court litigation, the Claimant served as the Debtor's general manager and chairman of the board, and was in charge of day-to-day operations. Robert P. Keating was President, serving on a part-time basis because of ill health.

The plaintiffs in the state court litigation were John J. Keating and his father, Robert P. Keating. They brought suit both individually and derivatively on behalf of the Debtor. The Claimant was the principal defendant and the Debtor a nominal defendant with respect to the derivative aspect of the case. The plaintiffs alleged the Claimant breached his fiduciary obligations owed both to them and to the Debtor in taking various actions which the master placed into three categories: (i) fraudulently inducing the plaintiffs to sign the 1985 stockholders' agreement which created the three classes of stock, (ii) causing the Debtor to enter into various transactions diverting funds to the Claimant and members of his family, and (iii) freezing the plaintiffs out of management of the company and thereafter terminating their employment. The master thought the plaintiffs had a thin case on the first two categories of claims. He gave them a 50% chance of success on the issue of employment termination, referring to the fiduciary obligations among stockholders in close corporations expounded in *Wilkes v. Springside Nursing Home, Inc.*, 370 Mass. 842, 353 N.E.2d 657 (1976). On July 8, 1992, shortly after receiving the master's report, the parties executed a settlement agreement. The principal elements of the agreement were the following: (i) provision for the Claimant's continued control of the Debtor through a revised capitalization, (ii) an option on the part of the Debtor to purchase the Class B shares of the plaintiffs and their family members for $4.5 million, which was to become a mandatory purchase at a price of $5.5 million if the option was not exercised in five years, (iii) payment of $150,000 to Robert P. Keating in consideration of the option, (iv) a consulting arrangement with Robert P. Keating paying $150,000 annually plus health benefits, and (v) a consulting arrangement with John J. Keating paying $41,000 annually.

The parties thereafter signed and filed a stipulation in court dismissing the case. The stipulation states in part: "Each party to bear his or its own costs and fees."

The Claimant bases his legal expense claim upon a by-law of the Debtor indemnifying its officers and director from certain

claims and related legal expenses,[1] which the Debtor adopted pursuant to Massachusetts General Laws, Chapter 156B, section 67.[2]

1. The by-law provides:

**Indemnification of Officers and Directors.** The Corporation shall indemnify and hold harmless each person who heretofore has served, is currently serving or hereafter serves:

(a) as an officer or Director of the Corporation;

(b) at the request of the Corporation, as an officer or Director of another organization; or

(c) at the request of the Corporation, in any capacity with respect to an employee benefit plan

from and against any and all claims and liabilities to which such person may be or become subject by reason of such service (including, without limitation, by reason of such person's alleged acts or omissions in the course of such service), and shall indemnify and reimburse each such person against and for any and all legal and other expenses reasonably incurred by such person in connection with any such claims and liabilities, actual or threatened, whether or not at or prior to the time when so indemnified, held harmless and reimbursed such person has ceased to serve in such capacity, except with respect to any matter as to which such person shall have been adjudicated in any proceeding not to have acted in good faith in the reasonable belief that his action was in the best interest of the Corporation (or, to the extent that such matter relates to service with respect to an employee benefit plan, in the best interests of the participants or beneficiaries of such plan); provided, however, that prior to such final adjudication the Corporation may compromise and settle any such claims and liabilities and pay such expenses, if such settlement or payment or both appears, in the judgment of a majority of those members of the Board of Directors who are not involved in such matters, to be in the best interest of the Corporation (or of the participants or beneficiaries of any such plan, as the case may be) as evidenced by a resolution to that effect adopted after receipt by the Corporation of a written opinion of counsel for the Corporation, that, based on the facts available to such counsel, such person has not been guilty of acting in a manner that would prohibit indemnification.

Such indemnification may include payment by the Corporation of expenses incurred in defending a civil or criminal action or proceeding in advance of the final disposition of such action or proceeding, upon receipt of an undertaking by the person indemnified to repay such payment if he shall be adjudicated to be not entitled to indemnification under this section, which undertaking may be accepted without reference to the financial ability of such person to make repayment.

The right of indemnification herein provided shall be in addition to and not exclusive of any other rights to which any such person may otherwise be lawfully entitled. As used in this section, all references to persons who are to be indemnified shall include their respective heirs, executors and administrators.

2. MASS.GEN.L. ch. 156B, § 67 provides:

Indemnification of directors, officers, employees and other agents of a corporation, and persons who serve at its request as directors, officers, employees or other agents of another organization, or who serve at its request in any capacity with respect to any employee benefit plan, may be provided by it to whatever extent shall be specified in or authorized by (i) the articles of organization or (ii) a by-law adopted by the stockholders or (iii) a vote adopted by the holders of a majority of the shares of stock entitled to vote on the election of directors. Except as the articles of organization or by-laws otherwise require, indemnification of any persons referred to in the preceding sentence who are not directors of the corporation may be provided by it to the extent authorized by the directors. Such indemnification may include payment by the corporation of expenses incurred in defending a civil or criminal action or proceeding in advance of the final disposition of such action or proceeding, upon receipt of an undertaking by the person indemnified to repay such payment if he shall be adjudicated to be not entitled to indemnification under this section which undertaking may be accepted without reference to the financial ability of such person to make repayment. Any such indemnification may be provided although the person to be indemnified is no longer an officer, director, employee or agent of the corporation or of such other organization or no longer serves with respect to any such employee benefit plan.

No indemnification shall be provided for any person with respect to any matter as to which he shall have been adjudicated in any proceeding not to have acted in good faith in the reasonable belief that his action was in the best interest of the corporation or to the extent that such matter relates to service with respect to any employee benefit plan, in the best interests of the participants or beneficiaries of such employee benefit plan.

The absence of any express provision for indemnification shall not limit any right of indemnification existing independently of this section.

A corporation shall have power to purchase and maintain insurance on behalf of any person who is or was a director, officer, employee or other agent of the corporation, or is or was serving at the request of the corporation as a director, officer, employee or other agent of another organization or with respect to any employee benefit plan, against any liability incurred by him in any such capacity, or arising out of his status as such, whether or not the corporation would have the power to indemnify him against such liability.

He contends the by-law requires indemnification of his reasonable legal expenses in the state court litigation unless there was a find-

ing he did not act in good faith. He points out no such adjudication took place here.

The Claimant ignores the provision in the by-law concerning settlement. If a claim against a director or officer is settled, the by-law requires a vote of disinterested directors stating settlement of the claim and payment of the director's or officers's legal expenses is approved because it is in the best interest of the corporation. The board vote, moreover, must follow receipt of a written opinion of corporate counsel opining the director or officer has not been guilty of acts which would prohibit indemnification. No such director's vote has been adopted here. Nor, in light of the Claimant's loss of control of the Debtor discussed later, is any such vote in the offing.

■ It is true section 67 of Chapter 156B does not prohibit indemnification where, as here, there has been no finding of bad faith. But the statute merely authorizes indemnification "to whatever extent" specified in the corporation's articles, by-laws or vote of a majority of its shares of stock. The Debtor's by-law places restrictions upon indemnification in the context of settlement which it does not impose when the litigation proceeds to final judgment. Under the by-law, only if there is no settlement is indemnification mandatory, even though there is no finding of bad faith.

The Claimant receives no support from *Dynan v. Fritz*, 400 Mass. 230, 508 N.E.2d 1371 (1987). The trial in that case proceeded to judgment without a finding of bad faith. Indemnification was mandatory under the governing by-law, which essentially tracked the wording of the statute. The present case is more like *In re Wall To Wall Sound & Video, Inc.*, 151 B.R. 700 (Bankr.E.D.Pa. 1993), where the by-law required passage of a directors' resolution.

■ There are other reasons the Claimant is not entitled to indemnification of these legal expenses. First, as part of the settlement, the parties agreed each would "bear his or its own costs and fees." The Claimant argues this language is merely an affirmation of the so-called American rule on legal expenses, and does not constitute a waiver of his indemnification rights. He observes in-

demnification rights are not mentioned in the stipulation, and stresses that the alternative settlement proposals made by the master expressly prohibited payment of the Claimant's legal expenses unless an equal amount was paid for the plaintiffs. Having heard the testimony, I am unconvinced. Like the settlement agreement, the master's proposals make no mention of indemnification rights; they merely refer to "advances for payment of attorneys fees and costs incurred by Paul...." In requiring each party to pay his or its own legal expenses, the settlement agreement is perfectly consistent with the master's proposals. Moreover, the attorney fee provision of the settlement agreement would accomplish very little if it merely affirms the American rule and has no effect upon indemnification rights. The American rule would control unless expressly rejected. And the plaintiffs, in their continuing capacity as stockholders, had good reason to prohibit the Debtor from paying the Claimant's legal expenses. Nor is it determinative that the Claimant may not have intended to waive indemnification when he signed the settlement agreement. The meaning of the agreement seems clear. In any event, having heard the Claimant's testimony, I am not convinced he intended to reserve his indemnification rights. He never asserted them before filing these claims.

■ Second, a substantial portion of the Claimant's expenses fall outside the type of expense covered by the by-law. The by-law authorizes the Debtor to indemnify a person serving as an officer or director from claims and related expenses to which the person is subject "by reason of such service...." Of the three categories of claims involved in the state court litigation, two did not arise from the Claimant's services as an officer or director. Causes of action for the Claimant inducing the plaintiffs to enter into the 1985 stockholders' agreement and terminating the plaintiffs' employment were based, at least primarily, upon the fiduciary obligations owed by a controlling stockholder of a close corporation to his fellow stockholders.

■ Finally, the claim of $161,032.78 filed on July 11, 1994, after the bar date, represents an unallowable increase of $99,205.97

from the timely $61,826.81 claim. The increase is due to sums owed but not paid to law firms who represented the Claimant in the state court litigation—$84,389.44 owed to Bowditch & Dewey and $14,816.53 owed to Friedman & Atherton.

A claim may normally be amended after the bar date provided it arises out of the same "conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading." Bankr.R.Civ.P. 7015(c)(2); *Northeast Office and Commercial Properties, Inc. v. Smith Valve Corporation (In re Northeast Office and Commercial Properties, Inc.),* 178 B.R. 915, 922 (Bankr. D.Mass.1995). The additional legal fees owed but not paid clearly qualify under this language because the legal services were rendered in the same litigation spawning the initial claim, which had included only sums actually paid out for the services.

An amendment after the bar date is only permissible, however, "when justice so requires." *Id.* at 923. Here justice does not so require. The Claimant knew, before the bar date, he owed these legal bills. More important, there is much that transpired after the bar date and prior to the filing of the amended claim on July 11, 1994. On June 17, 1994, the court confirmed the so-called Three Party Plan proposed by members of the family of Robert P. Keating, Old Castle, Inc. (a competitor of the Debtor) and Fleet Bank of New York (the Debtor's principal lender). In formulating and proposing their plan, these three parties relied upon the $61,826.81 proof of claim. True, the proponents of the Three Party Plan largely waived the condition, previously imposed by them, that unsecured claims not exceed $7 million. But that does not mean they did not rely on the amount of claims filed as of the bar date. To the contrary, I find they executed the waiver relying upon the amount of timely-filed claims.

**B.** *Claimant's Personal Bankruptcy Case*

■ The legal expense claim also includes expenses related to the Claimant's personal chapter 11 case, which he filed in this court on February 10, 1994. His bankruptcy filing was caused by his personal guaranty of the Debtor's indebtedness to Fleet Bank of New York, which exceeded $20 million. In the initial claim of $61,826.81, the Claimant included only $7,500 in expenses related to that bankruptcy proceeding. This was for the retainer he paid to Hanify & King, P.C. His third claim for legal expenses (in the sum of $248,532.78) adds $87,500 in fees owed to Hanify & King, P.C. for additional services related to his personal bankruptcy. The additional expenses are primarily the result of Fleet having filed on March 25, 1994 and May 11, 1994 complaints requesting denial of the Claimant's discharge in bankruptcy and a determination that the Claimant's debt to Fleet under his personal guaranty is nondischargeable.

The equities tilt in favor of allowing the filing of this amended claim after the bar date. The nondischargeability litigation had not been commenced by the bar date, so the Claimant cannot be faulted for not having anticipated the additional expense. And, being a party to the litigation, Fleet had reason to know the Claimant would incur substantial additional legal expenses after the bar date. Fleet's knowledge should be charged to its plan co-proponents.

■ This portion of the legal expense claim suffers, however, from a basic defect. Fleet's nondischargeability claim against the Claimant arose solely as the result of the Claimant's personal guaranty of the Debtor's indebtedness to Fleet. As discussed, the Debtor's by-law requires indemnification only with respect to claims and related expenses to which a party serving as an officer or director becomes subject "by reason of such service." Despite his protestation to the contrary, the Claimant did not execute the guaranty as an incident to his service as an officer or director. He signed it because he and members of his family owned a 50% interest in the Debtor. Part of his motivation was obviously to protect his $180,000 salary and employment prerequisites. But this does not make his guaranty indebtedness a claim to which he is subject "by reason of . . . service" as an officer or director. The phrase connotes performance of duties as an officer or director. Signing the guaranty was not part

of the Claimant's duties. *Compare Heffernan v. Pacific Dunlop GNB Corporation,* 965 F.2d 369 (7th Cir.1992) (claim against director for failure to disclose environmental liabilities in sale of his stock deemed sufficient basis for indemnification of director even though Delaware statute and implementing by-law allowed indemnification only for claims made "by reason of the fact that he is or was a director ...").

Moreover, the Fleet nondischargeability cases have been dismissed pursuant to a stipulation of dismissal with prejudice. Thus under the by-law, a directors' vote and an opinion of counsel is necessary if indemnification is to be permitted.

## II. SEVERANCE PAY

■ The Claimant lost control of the Debtor as the result of confirmation of the Three Party Plan and denial of confirmation of the plan proposed by the Claimant on behalf of the Debtor. *See In re P.J. Keating Company,* 168 B.R. 464 (Bankr.D.Mass. 1994). The Three Party Plan cancelled the stock held by the Claimant and his family, and issued new stock to the proponents of the Three Party Plan. Under its new ownership, the Debtor terminated the Claimant's employment on June 18, 1994, a day after the order of confirmation, paying the Claimant through June 30, 1994. The initial claim for severance pay, filed on the bar date, was in an "unknown" amount. The $273,461.54 claim filed on July 11, 1994 included a severance pay claim of $180,000, equal to the Claimant's annual salary.

The Claimant admits the Debtor had no written policy concerning severance pay at the time of his employment termination. He contends, however, the Debtor had an unwritten policy of granting severance pay to full-time employees who are members of the Keating family. In support of this position, he relies on the $150,000 payment made to Robert J. Keating as part of the settlement of the state court litigation. That is a weak reed to lean upon. Acting on behalf of the Debtor, the Claimant fired Robert P. Keating and John J. Keating without any offer to pay them severance pay. This employment termination was part of the state court litigation, but in that suit Robert and John Keating sought no severance pay. They instead requested that the Debtor be liquidated. Nor was the $150,000 payment designated as severance pay in the settlement. It was described as consideration for the stock option granted the Debtor by all the Class B shareholders. That the $150,000 equalled Robert's salary does not establish the payment was severance pay. The settlement agreement, moreover, provided for no flat payment whatsoever to John J. Keating, only $41,000 annual compensation for consulting.

I therefore find that at the time of the Claimant's employment termination the Debtor had no policy, written or unwritten, requiring severance payments to any of its employees, including members of the Keating family. I also find the Claimant did not rely upon any subjective perception that such a policy existed.

## III. VACATION PAY

■ The Claimant seeks $93,461.54 in accrued vacation pay, which he says represents 27 weeks salary. He was entitled to take four weeks paid vacation each year. He testified that in 1988 he and his sons decided to refrain from taking vacations, with the express understanding they would be compensated for unused vacation benefits when "things got better." Since then, he says, he took but one week's vacation, and other members of management "almost uniformly" complied with his direction to take no vacations.

Here again, I am unconvinced that any implied contract exists. The only written vacation policy the company had is contained in a memorandum to non-union employees dated August 2, 1985. In that memorandum, the Claimant stated "[t]here will be no carryover of vacation time to the next year." The unwritten "policy" or "promise" asserted to exist by the Claimant is supported only by actions of the Claimant and his two sons. John Del Rossi, the Debtor's treasurer, took vacations every year, as did John J. Keating. Nor was the "policy" ever approved by the Debtor's board of directors. I find the failure of the Claimant and his sons to take vacations merely represents their unilateral

**26**

decision to accrue their vacation pay, and was in opposition to general company policy. This imposed no implied contractual obligation upon the Debtor. The Debtor is obligated to pay the Claimant only two weeks' vacation pay for the six months he served in 1994. This comes to $6,923, which may be set off against the $42,833.81 the Claimant admits he owes the Debtor for miscellaneous advances.

## IV. HEALTH BENEFITS

■ The Claimant also seeks continuation, *ad infinitum,* of the health insurance the Debtor presently has in force for the benefit of the Claimant and members of his immediate family. He places no dollar amount on this claim. The Debtor has continued this coverage pending resolution of the present dispute.

The Debtor has no written policy concerning the provision of health benefits to terminated employees. Its general practice on health benefits to terminated employees not members of the Keating family is to provide health insurance coverage for 31 days after the employee's termination and to provide the employee the option to thereafter obtain insurance under the Debtor's policy at the employee's expense.

As of November 9, 1994, the Debtor provided health insurance coverage for the following members of the Keating family who were not its employees: Jacqueline Keating (widow of Robert P. Keating), the Claimant, Warren Keating (father of the Claimant), Michael Keating and Jeffrey Keating (the Claimant's sons), Patricia A. Keating (Robert's daughter), and Margaret Keating (the Claimant's mother), Mary Kate Coburn (the Claimant's cousin), and Janet Coburn (the Claimant's aunt). Patricia A. Keating is provided with dental insurance only. Mary Kate Coburn and Janet Coburn are provided health and dental insurance. The Debtor has charged Warren Keating's account for the cost of health and dental insurance provided to Margaret Keating and has charged the Robert Keating Family account for the cost of dental insurance provided to Patricia Keating. When John J. Keating was fired in the Spring of 1992, the Debtor continued his

medical coverage without charge until he found other employment in August of 1992.

It is obvious from the foregoing that the Debtor had a practice of continuing health coverage, without charge, for at least all Keatings formerly employed on a full-time basis until they found other employment with comparable coverage. I therefore conclude the Debtor has the obligation to do so for the Claimant.

■ The Debtor may set off its obligation to provide health insurance against the $42,833.81 owed it by the Claimant. The Debtor is therefore free to terminate the Claimant's health insurance immediately. The Debtor shall be obligated to reinstate such insurance only at such time when (i) the Claimant has no employment providing him and his family with comparable insurance, and (ii) sufficient time has elapsed so that such insurance, if continuously provided by the Debtor from August 1, 1994, would have cost the Debtor $35,910.91 (the $42,833.91 owed by the Claimant to the Debtor less $6,923 in vacation pay which the Debtor owes him). I choose August 1, 1994 to begin the period because of the Claimant's practice of providing health insurance for all terminated employees for a period of 31 days after employment termination.

## V. CONCLUSION

Except for the limited allowance of the Claimant's vacation and health insurance claims, I disallow all claims. A separate order has issued.